[No. 10282.   Department One.   September 4, 1912.]

C. C. DILL, *as Trustee etc., Appellant,* v. LENA L. CARVER
*et al., Respondents.*[1]

FRAUDULENT CONVEYANCES—PRESUMPTIONS—BURDEN OF PROOF—
EVIDENCE—SUFFICIENCY.  Under Rem. & Bal. Code, § 5292, providing
that, where any question arises as to the good faith of a transaction
between husband and wife, the burden of proof shall be upon the
party asserting the good faith, the presumption that a transfer by
a husband to a wife of 199 shares of corporate stock, valued at
$14,000, is fraudulent as to creditors, is not overcome by clear and
satisfactory proof, as required, where it appears that the husband
was indebted on a judgment for $8,900, that he was being pressed
for payment, that his claim that he did not know of the judgment
was unfounded in fact, and that he claimed that the transfer was
in consideration of $5,000 borrowed and of other stock which he had
borrowed and was holding for his wife, which at one time was of
the value of $9,000, but was worth only $1,000 at the time of the
transfer of the stock in question; and it further appears that the
$5,000 came from the sale of a house valued at $7,500 to which the
husband had contributed $6,000, that he had made statements that
he owned the stock, admitted that he had no intention of paying the
judgment, and his evidence was wholly uncorroborated.

Appeal from a judgment of the superior court for Spo-
kane county, Kennan, J., entered November 27, 1911, upon
findings in favor of the defendants, after a trial on the
merits before the court without a jury, in an action by a
trustee in bankruptcy to recover shares of corporate stock.
Reversed.

*Post, Avery & Higgins,* for appellant.
*Campbell & Goodwin,* for respondents.

MORRIS, J.—Appellant brought this action to recover
199 shares of stock of the Bartlett-Carver Company, a cor-
poration, alleging that the bankrupt had, without consider-
ation, transferred the same to his wife, Lena L. Carver,

[1]Reported in 126 Pac. 86.

with intent to defraud his creditors; and appeals from an adverse judgment.

The only creditor of the bankrupt whose claim is involved in this action is James D. Murphy, whose claim was merged into a judgment in the sum of $8,900, on June 18, 1910, about two months prior to the filing by Fred R. Carver of the petition in bankruptcy. Murphy's claim, as set forth in his complaint upon which judgment was entered, is that, on May 4, 1907, Fred R. Carver sold him 200 shares of the capital stock of the Forsyth Automatic Air & Steam Coupler Company, for $7,500, conditioned that, if at any time during the next two years Murphy was dissatisfied with the stock and desired to return it, Carver would accept such return and pay Murphy the $7,500 with six per cent interest; that Murphy, within the two years, became dissatisfied and tendered the stock to Carver, demanding the repayment of his money, with which demand Carver refused to comply. These facts, although disputed by Carver, having been established by the judgment, the only question to be considered is the character of the transfer of the stock from Carver to his wife.

At the time of the deal in the Forsyth stock between Carver and Murphy, they were both residents of Chicago. In February, 1908, Carver disposed of his business at Chicago and came to Spokane to complete a business arrangement with J. D. Bartlett, who was then engaged in business at Spokane. This arrangement was consummated by the organization of the Bartlett-Carver Company, capitalized at $40,000, divided into 200 shares of stock. Into this business Bartlett turned over the business he had previously been carrying on, and received from Carver $15,600 for a half interest. On March 7, 1908, Carver subscribed for 199 shares of the stock of the Bartlett-Carver Company in his own name, and for one share as attorney in fact for his wife, who was still at Chicago and did not arrive at Spokane until April 20, 1908. Soon after Carver's arrival at

Spokane, Murphy began writing him from Chicago, calling his attention to the agreement under which they entered into their stock deal, and, expressing his dissatisfaction, demanded the return of his money. There is much of this correspondence in the record, but in view of the judgment obtained by Murphy, it is immaterial and not necessary to be referred to, other than as indicating the fact that Murphy was pressing Carver for the return of his money and threatening to institute legal proceedings to enforce its collection, and as further supplying the reason, as contended by appellant, why subsequently and on October 9, 1908, Carver transferred his stock in the Bartlett-Carver Company to his wife. This being a transaction between husband and wife, is covered by Rem. & Bal. Code, § 5292, providing that:

"In every case where any question arises as to the good faith of any transaction between husband and wife, whether a transaction between them directly or by intervention of third person or persons, the burden of proof shall be upon the party asserting the good faith."

Under this statute we have uniformly held that any transfer of property between husband and wife was presumptively fraudulent as against creditors, and that whoever asserts the good faith of such a transaction must overcome this presumption and establish such good faith by clear and satisfactory proof. *Liebenthal v. Price*, 8 Wash. 206, 35 Pac. 1078; *Bates v. Drake*, 28 Wash. 447, 68 Pac. 961; *Canedy v. Skinner*, 50 Wash. 501, 97 Pac. 497; *Adams v. Wingard*, 53 Wash. 560, 102 Pac. 426; *Kalinowski v. Mc-Neny*, 68 Wash. 681, 123 Pac. 1074. We are, therefore, brought to an examination of the evidence offered by Carver, to ascertain whether he has overcome this presumption of fraud and establish the good faith and honesty of this transfer to his wife of all of his interest in a good business, save the one share which was subscribed for in the name of the wife by Carver as attorney in fact, which Mrs. Carver has transferred to him. First, Carver says that, at the time

of this transfer to the wife, he did not know he was indebted to Murphy. The judgment in the action brought against him by Murphy, which was entered with his consent, concludes this fact against him. It is to be noted in this connection also that, as early as July, 1908, Murphy, who had been writing him since the previous March claiming an indebtedness of $7,500, and demanding its payment, informed him that he would place the matter in the hands of attorneys with instructions to commence action against him, and that Murphy's attorneys had called on him demanding payment. In the face of the judgment this is not material, except as it may reflect upon the purpose and intent of Carver to so manipulate his property affairs as to hinder Murphy in his attempt to carry out his purpose of enforcing the collection of the $7,500 through legal action.

The next assertion offered to support the good faith of the transfer is found in Carver's testimony that, in April, 1907, he borrowed from his wife some stock which he had previously given her, referred to as Tribullion stock, to use as collateral to a loan of $3,000, required by him in his business. This loan was repaid and the Tribullion stock surrendered to Carver in May, 1907. Yet he kept this stock he claims to have borrowed from his wife, and never attempted to account to her for it in any way until he used it as the basis of the transfer of the Bartlett-Carver stock in October, 1908. He says, during all this time, he kept the stock for his wife to make it more valuable. This Tribullion stock he values at $8,000 at the time he borrowed it from his wife. It kept increasing in value until in December, 1907, it was worth in the neighborhood of three dollars a share, or $9,000 more than when he borrowed it. Still he says he did not return it to his wife, but retained it, hoping for a still greater increase in value.

We cannot understand why he did not return the stock to his wife in May, 1907, when the indebtedness for which it had been pledged was fully paid. Nor why it would not

grow as valuable in her hands as in his. Nothing seems to
have been done with it other than to place it in a pool with
other stock in an endeavor to increase its value. He says
the idea of claiming this stock as his own first came to him
after he came to Spokane, and from that time on he regarded
it as his stock, although no effort was made to have it trans-
ferred on the books of the company, and so far as any out-
ward indicia of ownership indicated to whom it belonged,
there was no change. This stock seems to have steadily
fallen in value from about December, 1907, until on October
9, 1908, when he made it one of the considerations for his
transfer of the Bartlett-Carver stock to his wife, it was
worth in the neighborhood of $3,000 on a falling market,
having slumped in the last valuation given to less than
$1,000. In placing a value on it for the purpose of the
transfer of the Bartlett-Carver stock, he fixes it at $8,000,
because it was worth that much when he borrowed it from
his wife, although its real value at the time of the transfer
did not exceed $3,000. To this he adds $5,000 which he
claims to have borrowed from his wife in November, 1907,
and computing interest on both valuations at eight per cent,
he makes the consideration for the transfer of the Bartlett-
Carver Company stock about $14,000. It might be noted
that this Tribullion stock was worth about $3,000 when he
gave it to his wife, or approximately its real value on Octo-
ber 8, the day of the transfer, when he fixed the value at
$8,000, to make part of the consideration for the transfer
of the Bartlett-Carver Company stock. The $5,000 he
claims to have borrowed from his wife came from the sale of
a house at Evanston, Illinois, which it is stated was valued
at $7,500, and to which Carver had contributed $6,000.

In explanation of the delay in transferring the Bartlett-
Carver Company stock to his wife, Carver says, at the time
when the stock was issued to him in March, 1908, it was his
intention to transfer it to his wife, and that from that time
he always regarded it as her stock, and that soon thereafter

he requested the transfer to be made, but that the secretary of the company was too much occupied with other affairs to attend to it. He admits, however, that, subsequent to the time when he first regarded this stock as his wife's and had in his mind transferred it to her, he may have made a statement to the local representative of R. G. Dun & Company that he and Bartlett owned all the capital stock of the Bartlett-Carver Company except two shares. Carver frankly admits that he had no intention of ever paying the Murphy judgment. This statement, it seems to us, throws much light on these various mental transfers of stock as between Carver and his wife, none of which, by the way, appear to have any support by any testimony from Mrs. Carver as to any of the transactions involved, nor does she appear to have had any knowledge, or to have taken any part in any, of these various transactions, unless it be that the day following the entry of the Murphy judgment, she became one of the trustees of the Bartlett-Carver Company.

We shall not attempt to discuss all the evidence, nor refer to other property in question here. It does not seem to us that this record can be read and the conclusion escaped that this transfer of the Bartlett-Carver Company stock from Carver to his wife was made for the purpose of defeating any collection of the Murphy claim, and that as to Murphy it was without consideration and fraudulent. Neither have we any doubt but that, with this stock covered up and placed beyond the reach of his creditors, if it could be successfully done, there was not sufficient property or assets remaining to satisfy the claims of creditors. We cannot, without unduly extending this opinion, refer to the other property remaining in Carver's name, which was scheduled by him as assets; nor give the reasons why we conclude them of insufficient value. It is sufficient to say we have no faith in their value to the extent claimed by Carver, or that they can be so valued as to say that, at the time of the transfer of this stock, Carver retained sufficient property to satisfy the

claims of his creditors. It is not to be wondered that Judge Rudkin, in passing on Carver's petition for discharge in bankruptcy, is quoted as saying in an opinion not published:

"If this were a proceeding under subdivision (e) of section 70 to avoid a transfer made by the bankrupt of his property for the purpose of defrauding his creditors, I might and perhaps would feel constrained to hold that the transfer was fraudulent, because the testimony of the bankrupt is uncorroborated and is anything but satisfactory. In the language of the referee, his story is 'amazingly suspicious,' but he has concealed no property from the trustee so far as the proof discloses, and the criminal charges have not been sustained to the requisite degree of certainty."

Upon the whole case as here made, we are of the opinion that the presumption that this transfer of stock between the husband and wife was fraudulent as against creditors has not been overcome by clear and satisfactory proof. We therefore hold that the 199 shares of the capital stock of the Bartlett-Carver Company in issue in this suit are the property of Fred R. Carver; that the transfer of the same by Fred R. Carver to Lena L. Carver on October 9, 1908, was fraudulent as to the creditors of Fred R. Carver, and such transfer should be set aside and held for naught, and the stock be surrendered to the trustee in bankruptcy. The judgment of the lower court is reversed, and the cause remanded for further proceedings in accordance with the views herein expressed.

MOUNT, GOSE, CHADWICK, and PARKER, JJ., concur.