[No. 11665.  Department One.  March 10, 1914.]

## E. O. PATTERSON, *as Receiver etc., Appellant,* v. EDWARD BOWES *et al., Respondents.*[1]

HUSBAND AND WIFE—COMMUNITY PROPERTY—PRESUMPTIONS.  The presumption that all property acquired after marriage is community property applies whether the legal title is in the name of the wife or husband.

FRAUDULENT CONVEYANCES—BETWEEN HUSBAND AND WIFE—GIFTS —BURDEN OF PROOF—EVIDENCE—SUFFICIENCY.  Under Rem. & Bal. Code, § 5292, making a gift from husband to wife presumptively fraudulent as to creditors, to be overcome only by clear and convincing evidence, a finding that there was a gift of between thirty and forty thousand dollars, with which the wife purchased real estate as her separate property, is not warranted by the evidence, where it appears that she had but a small estate when married none of which went into the property; the husband's evidence that he made her the gift in drafts or checks while free from debt was contrary to his affidavit in the action that the property in question was purchased with her separate estate acquired before marriage; it appeared that he conveyed the property to her by quitclaim deed, and neither the husband nor wife was able to give any information as to the drawer or drawee of the checks or drafts, or in what banks she deposited them, and she had no bank books or accounts; and that, at the time of the alleged gift, the husband was indebted to a bank in a large sum, and in a prior action they had pleaded that "they" owned the property.

Appeal from a judgment of the superior court for King county, Tallman, J., entered June 3, 1913, upon findings in favor of the defendants, adjudging that property attached was the separate property of the wife, in an action upon a community contract, tried to the court.  Reversed.

*E. H. Guie* and *J. A. Guie,* for appellant.

*John L. Rockwell, Charles F. Riddell,* and *Edwin C. Ewing,* for respondents.

GOSE, J.—On the 31st day of January, 1907, the respondent Edward Bowes and one Effinger executed to the Nye &

[1]Reported in 139 Pac. 225.

Ormsby County Bank, of the state of Nevada, their joint and several promissory note for the sum of $33,339.36, payable upon demand. At the same time, the makers each deposited with the bank, as collateral security, 9,000 shares of mining stock. The bank was given authority to sell the stock, with or without notice, either at public or private sale. The stock was sold and applied. This action was brought to recover the balance due upon the note. Ancillary to the suit, certain real estate situated in the city of Seattle, and standing of record in the name of the respondent Ada F. Bowes, was attached, upon the theory that it is the community property of the respondents Ada F. Bowes and her husband Edward Bowes. A personal judgment was entered for the balance due upon the note in favor of the receiver of the payee bank and against the respondent Edward Bowes "and the community composed of the said Edward Bowes and Ada F. Bowes, his wife," and the attached property was adjudged to be the separate property of Mrs. Bowes. The receiver has appealed from that part of the judgment fixing the status of the property. It is admitted that the debt is a community obligation. The single question presented by the appeal is whether the attached real estate is community or separate property.

The theory of the case presented by the respondents at the trial is that, in November or December, 1904, the respondent husband made a gift of between thirty and forty thousand dollars to his wife, and that the attached property represents the gift and its proceeds. The presumption is that all property acquired during the existence of the marital relation is community property, and this presumption obtains when the legal title is in the name of the wife as well as when it is in the name of the husband. Rem. & Bal. Code, § 5917 (P. C. 95 § 27); Weymouth v. Sawtelle, 14 Wash. 32, 44 Pac. 109.

Under our statute, Rem. & Bal. Code, § 5292 (P. C. 95 § 3), the gift was presumptively fraudulent as against creditors, and the burden was on the respondents to overcome this

presumption by clear and convincing evidence. *Liebenthal v. Price*, 8 Wash. 206, 35 Pac. 1078; *Kemp v. Folsom*, 14 Wash. 16, 43 Pac. 1100; *Bates v. Drake*, 28 Wash. 447, 68 Pac. 961; *Canedy v. Skinner*, 50 Wash. 501, 97 Pac. 497; *Dill v. Carver*, 70 Wash. 103, 126 Pac. 86.

The material question is, have the respondents overcome these legal presumptions? The respondents were married in 1892. The testimony shows that the wife was then a widow and possessed of a small estate. There is no evidence, however, that any part of this estate or its avails went into the Seattle property. The respondent husband operated as a promoter of mines and mining stock and in dealing in mining stock in the state of Nevada, from March, 1902, until some time in 1907. He testified that, in November or December, 1904, he gave his wife thirty-two or thirty-three thousand dollars in drafts or checks, and that he had no interest in the property in controversy. However, after the commencement of the action, he made an affidavit in support of the motion of Mrs. Bowes to dissolve the attachment, in which he referred to her estate at the time of her marriage, and in effect said that the property in controversy was purchased with the proceeds of this estate, making no reference at all to the alleged gift. It is obvious that, if he had made the gift in 1904, that fact would have occurred to him at the time he made the affidavit. The amount of the alleged gift is large, and it is incredible that it should have escaped his attention at that time.

On the 20th day of August, 1907, he conveyed the property in controversy to his wife by a deed of quitclaim. On his direct examination, he testified that, at the time of making that conveyance, he was free from debt; that the note was supposed to have been paid. He also testified that he did not know who made the payments on the note. In opposition to this testimony, the appellant produced statements taken from his (Bowes) private box in the state of Nevada, which showed that the bank had sold the collateral security and rendered

him an itemized account of the sales. He testified that he had never seen this statement. His evidence given at the trial is much weakened by the fact that it runs counter to his affidavit and to the statements found in his private box.

The wife testified that, in November or December, 1904, at a time when she was ill in the city of Seattle, her husband gave her checks or drafts for thirty-five or forty thousand dollars, they alone being present; that she did not know by whom the checks or drafts were drawn or upon what bank; that, at some time, the exact time not appearing, she deposited $2,000 of the checks in the First National Bank of Seattle; that she deposited the larger check—some thirty or thirty-two thousand dollars—in some bank in the city of San Francisco; that she does not know in what bank she made the deposit, and she does not know its location. She was asked whether she had $40,000 or $45,000, and answered, "I can't remember." She further testified that she had never seen or had so large a check before; that she had no bank books at the time of the trial and no checks and no written evidence of any of the deposits, and that she did not know where her bank books were. She was asked, "Where did you have the $30,000 deposited?" and answered, "I don't remember which one of the banks." She was again asked, "Where are your bank books of your California bank deposits?" and answered, "I don't know." She was asked, "Where are your checks?" and answered, "I don't know." In answer to a demand for her bank books and her accounts, she stated: "I haven't any bank books." She made a contract for the purchase of a tract of property in the city of Seattle for $46,000, upon which $14,000 fell due upon the 20th day of January, 1906. The written evidence shows that she drew upon her husband on or before January 23, 1906, two drafts, one for $10,000, and one for $5,000. The husband was unable to explain these drafts. She explained them by saying that she thought they were drawn for the purpose of arranging

for a trip to Europe. She did not go to Europe, however, for some fifteen months after making these drafts.

The respondents united in conveying the several tracts of property purchased from time to time in the city of Seattle, and they also united in the execution of mortgages and mortgage notes. In March, 1908, the respondent husband wired to Mr. O'Connor, his wife's brother, in Seattle: "You are fully authorized to execute mortgage and notes for $50,000, at eight per cent interest and four per cent commission on north forty feet lot 6, block 14, Boren's addition. Ada cabled. Wire me if executed." On the same date, the wife cabled her brother to the same effect. Their testimony is that the husband had no interest in this property; that he united in the notes and mortgages from the necessities of the case, and that the quitclaim deed was made for the purpose of placing the record title where it belonged. They further testified that the husband from time to time protested against executing notes and mortgages, asserting that he had no interest in the property. It is significant, however, that, at the time of the alleged gift, the respondent husband was indebted to the bank of Montreal in a large sum of money, seemingly not less than $20,000. Mr. O'Connor testified that, in November or December, 1904, his sister showed him checks or drafts for $30,000 and $3,000, and said that she had forty or fifty thousand dollars "that was absolutely her own;" that he made the first purchase for $20,000; that he drew on Mrs. Bowes for $1,000, and that later he was notified by some bank in Seattle, the bank not being named, that there was $30,000 to his credit; that he paid the balance of $20,000 out of this money, and returned $10,000 to Mrs. Bowes. He further said that he did not know the names of the drawer or upon what bank or banks the checks or drafts were drawn; that he did not know where she deposited them, and that he never saw the $30,000 draft which came to Seattle.

The testimony further shows that some six or seven pieces

of property were purchased in Seattle beginning early in 1905, and that all the purchases were made in the name of Mrs. Bowes; that the rent money was paid to her; that insurance policies were carried in her name, and that she paid the taxes. In 1910 a part of the property in controversy stood of record in the name of Mr. O'Connor. He mortgaged this property for $6,500 in settlement of the claim of the bank of Montreal against the respondent husband, and later conveyed it to Mrs. Bowes. It seems quite probable that the $15,000 was applied in payment of what is known as the Slyfield contract, upon which $14,000 became due on the 20th of January, 1906. This is the most satisfactory explanation of the drafts. In April, 1906, there was pending in the superior court of King county a suit to quiet title to the Slyfield property, in which the respondents were parties defendant. They answered admitting that *they* claimed to own the premises, and they pleaded affirmatively that *they* purchased the property at an agreed price of $46,000. Other defendants in the suit filed disclaimers. In November, 1906, a judgment was entered which recited that Mrs. Bowes was the owner in fee of the property. However, on the 27th day of September, 1907, they filed a motion in a case then pending in the superior court of King county, in which they stated that the supreme court had rendered its judgment adjudicating that the respondents were the sole owners of the property in controversy.

It is not questioned that, as against subsequent creditors, the respondent husband had a legal right to make the gift if it was in fact made and made in good faith. It seems incredible that, if the gift had been made, the respondent wife would have entirely forgotten the name of the bank in which she deposited it in San Francisco, when the deposit was made only a week or two after the alleged gift. It also seems incredible that she could not have traced the $30,000 draft from San Francisco to Seattle. Some six or seven tracts of prop-

erty were purchased in Seattle in her name beginning early in 1905; she had the dates of the purchase, and if the consideration for the purchase of the property was advanced by her, it seems certain that she would have been able to trace it through the banks. It is also difficult to believe that she would have lost all her bank books and checks, and that she would have been without these aids when upon the witnesss stand. The case is not free from difficulty; but when taken at large, we are unanimous in the view that the gift has not been sustained by that clear and convincing evidence which the law requires in transactions of this character when attacked by creditors.

The judgment is reversed, with directions to enter a judgment declaring the attached property to be the property of the community.

CROW, C. J., ELLIS, CHADWICK, and MAIN, JJ., concur.