[No. 2551]

N. B. CHRISTENSEN, RESPONDENT, *v.* VALDEMAR No. 12 OF THE DANISH SOCIETY OF CALIFORNIA AND NEVADA (A CORPORATION), FORMERLY KNOWN AS VALDEMAR No. 12 OF THE DANISH SOCIETY DANIA, AND A FRATERNAL ORGANIZATION, APPELLANT.

[208 Pac. 426]

1. LANDLORD AND TENANT—IN CONSTRUING CLAUSE OF LEASE. USES AND PURPOSES TO WHICH PREMISES HAS BEEN PUT MUST BE CONSIDERED—"GAMBLING."

Where a lease, executed after taking effect of the antigambling law in 1909 (Stats. 1909, c. 205), provided that. if gambling should ever become legally authorized in the state, the lessor or his assigns might regain possession on complying with certain conditions, in view of the amendment of the antigambling act in 1915 (Stats. 1915, c. 284), so as to permit playing certain gambling games where the deal alternates. and no percentage is taken, and since the word "gambling" includes a wide range of games. in construing the lease, the law as it existed prior to the adoption of the antigambling law and the uses and purposes to which the premises had been put must be taken into consideration in determining whether "gambling" had been legally authorized, as contemplated by the parties.

2. GAMING—"GAMBLING" DEFINED.

Playing poker for money or something of value is "gambling." Gambling may cover a wide range of games.

APPEAL from Second Judicial District Court, Washoe County; *Thomas F. Moran,* Judge.

Action by N. B. Christensen against Valdemar No. 12 of the Danish Society of California and Nevada. From judgment for plaintiff, defendant appeals. **Reversed and remanded.**

*Brown & Belford,* for Appellant:

In view of the present condition of the law on the subject, there has been no legal authorization of gambling, as provided in the lease; and until there is such legal authorization the tenancy of the appellant cannot be terminated. The court must construe the meaning and effect of the provision in the lease: "If gambling should be legally authorized in this state." If subsequent to 1911, and during the term of the lease, the legislature should legally authorize gambling, so that it might be conducted publicly, pursuant to such authorization, respondent was to have the right to reimburse the Danish society for its expenditures and resume possession of the premises. It was incumbent upon the plaintiff to show, clearly and explicitly, that there had been such a modification of the laws since 1911 as to legally authorize gambling; that there has been a restoration of conditions as they existed prior to the execution of the lease, so that the property might be used for gambling purposes. Under the statute this could not be done. Rev. Laws, 6510, 6520.

"In construing statutory provisions, judges make use of their knowledge of state history in ascertaining the mischief for which the legislature has sought to provide relief. The construction of statutes is aided in the same way, by judicial knowledge as to what shall be considered, in view of historical facts, to have been the intention of the parties." 16 Cyc. 869.

All doubts must be resolved in favor of the lessee. 24 Cyc. 915. In case of doubt as to the meaning of a lease or contract, it must be construed most strongly against the lessor and in favor of the lessee. Younger v. Moore, 103 Pac. 224.

*Sardis Summerfield,* for Respondent:

If gambling was legally authorized in this state when respondent made his tender and demanded possession of the leased premises, the judgment of the lower court should be affirmed. In 1909 the legislature passed a

comprehensive antigambling law. Stats. 1909, p. 307. In 1911 its provisions were incorporated in the Revised Laws, secs. 6518–6522. In view of the possibility that in the future the same power that enacted the anti-gambling law might legalize gambling, the proviso in the lease was agreed upon by the contracting parties in a form not only mutually binding upon them, but also upon their respective successors in interest; and in 1915 this possibility became a reality. Stats. 1915, p. 462. In the same year the legislature enacted an elabo-rate horse - racing gambling bill. Stats. 1915, p. 23. Betting on horse-racing is gambling. 12 R. C. L. p. 718.

Under the Reno charter act, passed by the legislature and approved by the governor, the power to license gambling was delegated to the city council. Stats. 1903, p. 184; Stats. 1921, p. 50. "To fix, impose and collect a license tax on and to regulate gambling games." Reno charter, art. XII, sec. 10. "The municipal ordinances and the state statutes are from a common source of authority. One class presents it in a delegated, and the other in a direct, form, but it is the power of the state which speaks in both." McQuillin, Mun. Ord., pp. 17, 18; State v. Reno T. Co., 41 Nev. 425. Valid municipal ordinances have the same force and effect as if they had been passed directly by the legislature. N. O. Water-Works v. New Orleans, 164 U. S. 471.

By the Court, COLEMAN, J.:

1. This action grows out of the lease described in a case of the same title reported in 46 Nev. 144. The complaint pleads the execution on September 5, 1911, by one Dreyer of a contract of lease with the defendant of the upper story of certain premises situated in Reno, Washoe County, Nevada, and the transfer thereafter of the property by Dreyer to the plaintiff, subject to the terms of the lease. The lease contains a provision that the lessor, or his assigns, might, upon certain conditions, "if gambling should be legally authorized in this state," become entitled to the possession of the premises. It is

also averred that, pursuant to an amendment to the city charter of Reno, as adopted by the state legislature, the city council has authority "to fix, impose, and collect a license tax on, and to regulate * * * gambling games," and that the city council had adopted an ordinance providing for the licensing of the games of poker, stud poker, five hundred, solo, and whist, and that the conditions mentioned in the lease had been complied with by the plaintiff. Other averments are contained in the complaint, but in the view we take of the case it is not necessary to prolong this opinion by reciting them.

An answer was filed denying certain allegations of the complaint, among others, that gambling had been legally authorized in this state. There is contained in the answer certain affirmative allegations, wherein it is charged that for some time prior to the making of the lease public gambling had been conducted on the premises, for profit; that the games so conducted included roulette and faro; that prior to the execution of said lease the legislature of the state had by statute prohibited the conducting of said games in this state, and had made it unlawful to operate gambling games. It is further averred that, in view of the conditions growing out of the enactment of the antigambling act, Dreyer induced the defendant to become a tenant of the premises in question. Other allegations tending to maintain defendant's theory are contained in the answer, but what we have alluded to will suffice for the purpose of the case.

A demurrer was filed to the affirmative matter pleaded in the answer, which was sustained by the court. This ruling is assigned and urged as being prejudicial error. We think the court erred in sustaining the demurrer. The determination of the controversy which has arisen depends entirely upon the construction which is to be ultimately given to the words in the lease, "if gambling should be legally authorized in this state." Counsel for respondent says that, since the legislature in 1915 amended the law so as to permit the playing of poker,

stud poker, five hundred, solo, and whist, when the deal alternates and no percentage is taken, and betting upon horse - racing, in view of the city ordinance of Reno, gambling has been legally authorized in this state.

Prior to 1909 a person might conduct a public gambling-house and operate numerous games of chance, or gambling games, for profit, by procuring a license and paying a fee therefor. Stats. 1885, p. 12; Cutting Comp. Laws, 1263. In 1909 the legislature enacted a rigid antigambling law (Stats. 1909, c. 205) which interdicted all of the well-known gambling games, such as were then operated in the public gambling-houses of the state. The law was in effect at the time the lease in question was entered into. In 1915 (Stats. 1915, c. 284) the legislature amended the antigambling act so as to permit the playing of poker, stud poker, five hundred, solo, and whist, where the deal alternates and no percentage is taken. Pursuant to this amendment and the provision of the city charter of Reno, the city council adopted an ordinance licensing the games just enumerated when they are not conducted for a percentage and when the deal alternates.

2. As said by counsel for respondent, the pivotal question ultimately to be determined in this case is: Has gambling been legally authorized in this state? He says that betting on glove contests and horse-races is gambling. This may be true; and playing poker for money or something of value is gambling. It is also true that gambling may cover a wide range of games; probably men might gamble on a game of marbles or casino. Assuming that counsel's contention that betting on a horse-race is gambling, could it be said with reason that, had gambling on horse-races alone been legalized in this state, it would justify the termination of the lease in question? Counsel for respondent says it would, notwithstanding the fact that gambling on horse-racing might not in the least affect the business carried on upon the premises in question, or the value of the property, in any way.

In view of the fact that the word "gambling" includes a wide range of games, some of which might not in the least affect the value of the property or its productivity, it seems only reasonable that the parties in entering into the lease, by using the word "gambling," must have attached to it a meaning which can be arrived at by considering not only the law as it existed prior to the adoption of the antigambling law, but the uses and purposes to which the premises had been put—indeed, all of the facts and circumstances throwing light upon the situation. We think the correct rule applicable to the situation is expressed in Hoffman v. Ætna F. Ins. Co., 32 N. Y. 405, 88 Am. Dec. 337, where it is said:

"The matter in hand is always presumed to be in the mind and thoughts of the speaker, though his words seem to admit a larger sense; and therefore the generality of the words used, shall be restrained by the particular occasion"—citing Powell on Contracts, 389; Van Hagen v. Van Rensselaer, 18 Johns. [N. Y.] 423.

Again:

"Words should not be taken in their broadest import, when they are equally appropriate in a sense limited to the object the parties had in view."

In Anderson v. Mutual L. I. Co., 164 Cal. 713, 130 Pac. 726, Ann. Cas. 1914B, 903, the court gave expression to the following:

"But, in construing any writing, the usual definition of a single word is not a conclusive test of the meaning to be attributed to it in the connection in which it is found. We must endeavor to ascertain, from an examination of the entire instrument, read in the light of the circumstances surrounding its execution, the sense in which the parties employed the particular phrase in question."

The Supreme Court of New Jersey, in Chism v. Schipper, 51 N. J. Law, 1, 16 Atl. 316, 2 L. R. A. 544, 14 Am. St. Rep. 668, quotes approvingly the following from an opinion by Gibson, J.:

"The best construction is that which is made by viewing the subject of the contract as the mass of mankind

would view it, for it may be safely assumed that such was the aspect in which the parties themselves viewed it."

What we have said as to the interpretation to be put upon the word "gambling" applies with equal force to the words "legally authorized."

The court having erred in its ruling upon the demurrer to the affirmative matter pleaded in the answer, it is ordered that the judgment be reversed, and the case remanded for further proceedings in accordance with the views herein expressed.