In the case at bar the testimony of respondent himself, together with the testimony of appellant and other witnesses, establishes undisputedly that the deceased wife of George Wilson, from the time of their marriage down to the year 1926, devoted her entire time, energy and labor to the furtherance of the business of the Prater Company, which was a Wilson corporation and in which Mrs. Wilson was part owner. That while she did not work for a specified salary, the evidence does show that the deceased, at all times, had access to and the control of the money of the corporation, and, with the consent of George Wilson, had full authority to draw upon the same for her own purposes, and that no objection whatever was ever made by him to any appropriation she made of the community property. It, therefore, must be concluded, under the decision of *Page 355 
this court in the case of Goldsworthy v. Johnson, 45 Nev. 355,204 P. 505, that such conversion by the wife with the knowledge and consent of her husband amounted to a gift from the husband to the wife, and was deemed to be her separate property.
The consent of George Wilson to and the depositing of the money in the joint account amounted to a delivery of this deposit to the wife, and was in law a gift and constituted the same her separate property. Goldsworthy v. Johnson, supra; Potter v. Smith (Cal.), 191 P. 1023.
It will be observed that in the year 1933, during the pendency of a divorce action instituted by the wife, the husband, in order to obtain the benefit of a change of the place of trial, filed his affidavit in support of such application, in which he solemnly declared, under oath, among other things, that there was no community property situate in the county of Washoe, where the action was originally brought by his wife, and that all of the community property of the parties was situate in Storey County. It is apparent from this declaration that George Wilson himself at that time recognized and conceded the fact to be that the property situate in Washoe County and held under conveyance to his wife was her separate property.
Under our statute, sec. 3364 N.C.L., where the husband and wife are living separate and apart, before the husband can claim the salvage of his dead wife's estate he must show that his desertion was for a justifiable cause and such cause as would have entitled him to a divorce.
Whatever respondent's belief or his mistake might have been at the time of making his affidavit for change of place of trial in the divorce action, it could not make community property into separate property. Potter v. Smith (Cal.), 191 P. 1023.
The presumption is that property acquired by either *Page 356 
spouse during coverture is community property, and all the more so when granted by third parties, irrespective whether the husband or the wife is named as grantee. In this case the grantee is "Gussie Wilson, wife of George Wilson," and the court found and all the intendments of the decision are that the record title stands in the name of George Wilson as a matter of law. Wells v. Allen, 177 P. 180; Fulkerson v. Stiles, 108 P. 966; Fanning v. Green, 104 P. 309; sec. 3356 N.C.L.
Without a conclusive showing that the husband abandoned his wife and also lived separate and apart from her, he does not forfeit his rights to all the community property or to any part of the same. Sec. 3364 N.C.L.
Without a showing of a gift by the husband to the wife of her earnings and accumulations, they do not become her separate property, Sec. 3369 N.C.L.
When a wife voluntarily and with the consent of her husband, and the husband with the consent of the wife, dwell in separate communities for health, business, or economic reasons, it does not amount to a living apart within the meaning of the law. Makeig v. United, etc. Co., 296 P. 673.
By the same token it would not constitute a living apart under the five-year divorce statute. There is no evidence of abandonment or living apart for five years, or at all. Sec. 9467.06 N.C.L.
And the question of cause for divorce or fault does not enter such cases. The decree of the trial court cannot be coerced. It is discretionary. Herrick v. Herrick, 55 Nev. 59, 25 P.2d 378.
 OPINION
Julia Wilson, sometimes known as Gussie Wilson, died intestate February 2, 1934, in Washoe County, Nevada. She left surviving her George P. Wilson, her *Page 357 
husband (respondent), and Elaine Taylor, her daughter (appellant), both being over the age of twenty-one years. Respondent was appointed administrator of the estate. In due course of administration and on January 5, 1935, respondent, as administrator, filed his petition for distribution wherein the estate, consisting chiefly of two fractional city lots, with improvements, was alleged to be community property which, he prayed, should be distributed to him as the surviving husband. Appellant filed objections to the granting of said petition upon the ground that respondent had abandoned said Julia Wilson for more than five years next preceding her death. Appellant also filed, in said estate, a petition for distribution, setting forth that the property in dispute was the separate property of her mother; that respondent had abandoned her during her lifetime; that said property was acquired by said Julia Wilson with her own means which were her separate property; that respondent had full knowledge of the purchase of said lots and improvements and consented that his wife take said property in her own name and as her separate property. In his answer to appellant's said objections and petition, respondent denied the material allegations therein contained, except that in said answer he admitted that for several years prior to the death of his wife they had not cohabited, but that this was at the desire and request of the wife, without the fault of petitioner, and against his will and wishes. After a hearing, the district court decided that the property in dispute was community property; that respondent had not made a gift thereof to said Julia Wilson; and that respondent had not abandoned her. Appellant's objections were overruled, her petition for distribution denied, and the court awarded said property to respondent. This appeal is taken from the orders overruling appellant's said objections and petition and from the decree distributing said property to respondent.
Two questions are presented on this appeal: (1) After the marriage was any of the community property of the husband and wife converted into the separate *Page 358 
property of the wife by any gift made or acquiescence manifested by the husband or otherwise? (2) After the marriage did the husband forfeit his right to inherit and receive all or any of the community property, by reason of any abandonment of and living separate and apart from his wife without having grounds for divorce against her?
Section 3364 N.C.L. reads as follows: "Upon the death of the wife the entire community property belongs, without administration, to the surviving husband, except that in case the husband shall have abandoned his wife and lived separate and apart from her without such cause as would have entitled him to a divorce, the half of the community property subject to the payment of its equal share of the debts chargeable to the estate owned in community by the husband and wife, is at her testamentary disposition in the same manner as her separate property, and in the absence of such disposition goes to her descendants equally, if such descendants are in the same degree of kindred to the decedent; otherwise, according to the right of representation; and in the absence of both such disposition and such descendants, goes to her other heirs at law, exclusive of her husband."
Section 3369 N.C.L. provides that: "When the husband has allowed the wife to appropriate to her own use her earnings, the same, with the issues and profits thereof, is deemed a gift from him to her, and is, with such issues and profits, her separate property."
Respondent and Julia Wilson were married in November, 1912, and remained husband and wife until the latter's death. At the time of the marriage appellant, daughter of said Julia Wilson, was four years old. It appears that before the marriage Julia Bailey (later Mrs. Wilson) had no property. She had for some time been working as bookkeeper for N.C. Prater Company, a corporation, at a salary of $35 per month. After the marriage, she kept house for respondent and her daughter for approximately two years, during which time the *Page 359 
corporation employed another bookkeeper. Mrs. Wilson then went back to her work as bookkeeper and continued in that capacity and in helping to conduct the business until 1926. Practically all of the capital stock of said corporation was owned by respondent. Mrs. Wilson owned four shares. Mr. Wilson was president, and Mrs. Wilson secretary. Checks could be drawn by either. Besides the company's grocery store, which was operated at Virginia City where Mr. and Mrs. Wilson lived, N.C. Prater Company acquired and owned more than a dozen other pieces of property in said city, the titles of which were in the name of the corporation. There was no agreement or understanding that Mrs. Wilson should receive any salary after the marriage. Respondent did most of the work of conducting the business, and out of its proceeds the living expenses were taken for him, Mrs. Wilson, and appellant. Appellant was supported and educated by respondent, and respondent paid the premiums on an insurance policy on Mrs. Wilson's life, wherein appellant was beneficiary and on which appellant has received $2,000.
In 1926 Mrs. Wilson moved to Reno. This step was taken, according to respondent, for the benefit of her health. Appellant claims that there was an additional reason, namely, lack of attention to and consideration for Mrs. Wilson on the part of respondent.
After going to Reno Mrs. Wilson divided the funds in the Virginia City bank into three parts, one being left in that bank, another placed in joint savings account in the First National Bank in Reno, and the third in joint savings account in the Washoe County Bank of Reno — said savings accounts each in the names of respondent and Mrs. Wilson, not in the name of the corporation. Respondent thinks it was not until after Mrs. Wilson's death that he learned of the accounts in the Reno banks having been placed by Mrs. Wilson in their joint names. He says he trusted her in everything, and that while he knew she was putting some of *Page 360 
the company's money in Reno banks, he assumed it was deposited in the name of the corporation, as it had been at Virginia City.
Not long afterwards, with respondent's consent, a home was purchased in Reno for $8,300. This was known as the Marsh avenue property. The deed was made to Mrs. Wilson, "wife of George P. Wilson." Respondent testifies that this also was done without his knowledge, and that the first time he knew of it was after Mrs. Wilson commenced suit for divorce in the fall of 1933. The Marsh avenue premises constitute the main property in dispute. The money paid for it was taken from the savings accounts in the Reno banks.
Mrs. Wilson commenced suit for divorce against respondent on October 28, 1933, a little more than three months before her death. The complaint contains the following paragraph: "That there is a very considerable amount of community property belonging to the plaintiff and the defendant, same being located in Storey county, Nevada, and in the state of California, and possibly elsewhere. That the plaintiff asks that the defendant be required to set forth and describe all of his assets so that this court may determine the amount of community property owned by the plaintiff and the defendant, and determine what is and what is not community property. That by reason of the separation which has existed between the parties for many years, the plaintiff is unable at this time to further describe the assets of the defendant and the community property owned by the parties." The only ground for divorce alleged in the complaint is that the parties "have lived apart for five consecutive years without cohabitation." Neither willfull desertion nor extreme cruelty is alleged. The complaint does not describe or mention any specific article or piece of property, real or personal. Besides a decree of divorce, the complaint prays for permanent alimony and an order "dividing the community property of the parties upon such terms as is meet, proper and equitable." Respondent noticed for hearing a motion for an *Page 361 
order changing the place of trial of said divorce action from Washoe County to Storey County. In support of this motion he made an affidavit on November 2, 1933, which, among other things, set forth that the divorce action "does not affect any real property or estate right or interest therein in Washoe county or in any other county other than Storey county, Nevada." Respondent's petition for letters of administration, filed February 14, 1934, specifically mentions the Marsh avenue property as part of the estate left by his deceased wife, but says nothing as to whether it is community or separate property. The inventory lists said property as one item of the estate left by Mrs. Wilson, and states that all of the estate is community property.
The record indicates that the checks drawn by Mrs. Wilson were uniformly connected with the business of the corporation, or were for household and living expenses. Respondent appears to have been liberal with her. On a couple of occasions, when she drew about $300 one month and $350 another, respondent informed her that the business would not stand so much, and thereafter she materially lessened the amounts. When the bank at Virginia City closed in the fall of 1932, it became necessary for respondent to limit her to $50 and $60 a month. All things considered, the record shows that respondent provided liberally for Mrs. Wilson until the day of her death. Respondent testified that shortly before the Marsh avenue property was purchased Mrs. Wilson said she "wanted a home in Reno for both of us." They went together to look at the Marsh avenue premises, after having already looked at another property. Mrs. Wilson wanted respondent to buy a lot next to the Marsh avenue property and build a store on it. She also wanted him to make other investments in Reno, but he had lived in Virginia City all his life and built up his business there, and thought best not to invest in Reno other than for the care and comfort of Mrs. Wilson. When the Marsh avenue property was purchased, there was sufficient money in the Virginia City account to pay for it; *Page 362 
but Mrs. Wilson used the savings account deposits in Reno for that purpose.
On May 6, 1931, Mrs. Wilson wrote respondent the following letter: "Reno, Nevada, May 6, 1931. George: Your letter of April 28th received some time ago. I can't see how anyone could manage a home, keep it in good repair as homes should be kept, pay heavy taxes, fire insurance, life insurance, keep up the car and carry a full coverage on that, for my own protection as well as other peoples' and not owe any bills on less than $150.00 or $5.00 per day. If you think it can be done let me know what amount you think one could manage on. I do all my own work except spade the yard, and mow the lawn. As you said I am aware the store is making no money. I was aware of that three years ago and could see a little farther than my nose, when we I wanted you to close up the shop when you" (change from "you" to "we" made by Mrs. Wilson) "had a nice balance in saving and checking and owed no one.' The property on Plumas Street I showed you has increased in value as the Junior High was built five blocks from there. `Nuf sed.' I am drawing $150.00 today as my April bills are due and I have to pay $65.79 for insurance on the car this month. In the three years I had it, including the trip to Denver and return, I have run around 16,000 miles, so you see I don't live in the car. Two years your car ran 30,000 miles in one year. Hope this finds you well again. It is surely tough to be sick. Gussie"
Mrs. Wilson went to Reno in 1925, and the Marsh avenue property was purchased in 1926. While she was living there, and until some time in 1929, respondent visited her practically every Sunday, taking with him on each trip sufficient groceries to last until his next trip. He also visited her at other times, when business called him to Reno. On one of the Sunday visits (respondent thinks it was in 1929) Mrs. Wilson, according to respondent, told him to take six bits and *Page 363 
go get his dinner — she was "not going to stay in and cook dinner for me on Sundays." After that he discontinued his Sunday visits, and according to testimony given by appellant and her witnesses, his visits to Mrs. Wilson practically ceased altogether. Respondent positively denies this, saying that he continued visiting his wife, though not so frequently as before, "off and on" until she filed suit for divorce in October, 1933. Mrs. Holland, housekeeper in the Wilson home at Virginia City since June, 1927, testified that Mrs. Wilson came to Virginia City and remained at the Wilson home about ten days in the Christmas-New Year season of 1927-1928. She also came to the house on another occasion and stayed four or five days — Mrs. Holland thinks this was early in 1929. She testified further that Mrs. Wilson came to Virginia City near the end of August, 1930, to attend the funeral of respondent's brother. After the funeral, Mrs. Wilson, appellant, and the latter's daughter came to the Wilson house and had lunch, and stayed for awhile after lunch. Mrs. Holland testified that respondent and Mrs. Wilson appeared to get along "very nice." Appellant and her witnesses introduced evidence tending to show that respondent was neglectful and inconsiderate of his wife. They also testified that respondent had been seen in the company of other women, but there was no proof of infidelity, or of clandestine meetings with any of them. Mrs. Somers, who was for a time bookkeeper for the corporation, and also for another period housekeeper in the Wilson home, testified that so far as she could see everything was harmonious between respondent and Mrs. Wilson. Respondent testified in part as follows:
"Q. You have heard the testimony of Mrs. Holland about her coming there in '29, staying four or five days in Virginia. Do you remember that incident and what time of the year it was? A. I forgot, I could not remember.
"Q. Do you remember her being there and staying for four or five days? A. Yes, sure. *Page 364 
"Q. When she came there and stayed that time why you went ahead and had ordinary marital relations? A. What?
"Q. I say, the marital relations were held at that time? A. Yes, she stayed there.
"Q. Just the same as ordinary? A. Yes.
"Q. Well, now, after this 1929, or whatever time it was that she told you she would not cook, you say you saw her on frequent occasions? A. I would run over very often, if I would have something to say to her."
1, 2. It is regrettable that the question whether the property involved in these proceedings is community or separate property could not have been determined while Mrs. Wilson was living. As it is, we must take the testimony as we find it. It is a general rule, established by a long line of decisions in this court, that the lower court will not be reversed on an issue of fact where there is substantial evidence to support its findings. Notwithstanding this rule, the court will reverse where it is very clear that the findings are not supported by the evidence. The affidavit made by respondent on November 2, 1933, considered with some of the other evidence, naturally raises some doubt regarding the correctness of the findings of the district court. Upon careful consideration, however, of all the evidence, we do not feel justified in disturbing the order and decree appealed from.
3. The contention that the deposits in the Reno banks operated as a gift to Mrs. Wilson is wholly without merit. And this is true regardless of whether respondent knew that the deposits were made by Mrs. Wilson in their names instead of that of the corporation.
4. Likewise, the fact that Mrs. Wilson was named as grantee in the deed of the Marsh avenue property is by no means sufficient to show a gift from respondent to her. 13 R.C.L. 1384, 1385. Nor are the joint bank deposits and said deed, or either of them, sufficient to show that the moneys deposited in the Reno banks, or the Marsh avenue premises purchased therewith, were transmuted into the separate property of Mrs. *Page 365 
Wilson. Even if respondent knew that the deed was made to Mrs. Wilson, the presumption would still be that it was community property. Milisich v. Hillhouse, 48 Nev. 166, 228 P. 307; 5 R.C.L. 844-846; 31 C.J. 54; Nilson v. Sarment, 153 Cal. 524,96 P. 315, 126 Am. St. Rep. 91. This rule has been changed in California by statutory amendment, but the Nevada statute remains the same as the California statute was before it was amended.
5. All property acquired after marriage is presumed to be community property. Jones v. Edwards, 49 Nev. 299, 245 P. 292; Barrett v. Franke, 46 Nev. 170, 208 P. 435.
6. The true test of the separate or community character of property acquired during marriage ordinarily lies in whether it was acquired by community funds and community credit or by separate funds. Rawlings v. Heal, 111 Wn. 218, 190 P. 237; 31 C.J. 23.
7. The community estate may be vested in either spouse, and the true character of the property is to be determined by the nature of the transaction under which it is acquired without reference to who retains the title. Killian v. Killian, 10 Cal.App. 312,101 P. 806; Benson v. Hunter, 23 Ariz. 132, 202 P. 233; Patterson v. Bowes, 78 Wn. 476, 139 P. 225.
In states where the statutes provide that the earnings and accumulations of the wife, while living separate from the husband, are her separate property, the word "accumulations" applies to property obtained and held in possession by the wife, while living separate from her husband, through her own industry, labor, skill, or efforts of any kind; but it does not apply to property acquired by the wife by purchase with community funds. Union Oil Co. v. Stewart, 158 Cal. 149, 110 P. 313, Ann. Cas. 1912A, 567; 31 C.J. 23.
Whatever is gained by the toil or talent of either spouse belongs to the community. Malmstrom v. People's Drain Ditch Co.,32 Nev. 246, 107 P. 98; Adams v. Baker, 24 Nev. 375, 55 P. 362.
Generally, property purchased by either husband or *Page 366 
wife during the existence of the community is community property — the "ultimately determinative consideration in any case being whether the purchase was made with community or with separate funds." 31 C.J. 36.
8. Property purchased with the earnings of husband and wife, or the earnings of a husband or wife, is community property. Winchester v. Winchester, 175 Cal. 391, 165 P. 965; Ahlstrom v. Tage, 31 Idaho, 459, 174 P. 605; Marsh v. Fisher, 69 Wn. 570,125 P. 951. This rule does not apply in case of property purchased with earnings of the wife under sections 3368 and 3369 N.C.L.
9. When it is made to appear that property was once community property, it will generally be presumed that it maintains that character until some direct evidence to the contrary is adduced, and the burden of proof rests on the party claiming the contrary. Laws v. Ross, 44 Nev. 405, 194 P. 465; Barrett v. Franke, 46 Nev. 170, 208 P. 435.
Counsel for appellant cite Goldsworthy v. Johnson, 45 Nev. 355,204 P. 505, and Potter v. Smith, 48 Cal.App. 162,191 P. 1023. A reading of those cases will at once disclose that the facts differ so widely from those in the case at bar as to be of very little assistance to the court. In the Goldsworthy case, Mrs. Goldsworthy, after her husband had lost his position at Ione, left home with his consent and worked for third persons, putting her earnings in a separate bank account with the knowledge and approval of her husband. At the same time, she and her husband maintained a joint community account. The evidence in that case further discloses that Mrs. Goldsworthy paid an indebtedness of her husband out of her separate account, and that he later repaid her the greater portion of this amount. In the Potter case the husband assigned notes and funds to his wife. She used the proceeds to purchase real estate during some twenty years while they were living together. He then left home for fifteen years and came back after her death to claim the property as community property. *Page 367 
The exception in section 3364 N.C.L. requires not only that the husband live apart from the wife without such cause as would have entitled him to a divorce, but also that the husband shall have abandoned her. We do not feel justified in setting aside the finding of the district court that respondent did not abandon Mrs. Wilson. It was she, not respondent, who, admitting it was for good reasons, left the domicile at Virginia City and went to Reno. He not only visited her there, but supported her until her death, regardless of her illness and the loss of her companionship for a great part of the time. The evidence does not show much interest on the part of Mrs. Wilson in respondent after 1929. It does not appear that she went to see him often, or that she tried to persuade him to visit her more frequently. Insofar as there was any separation, it appears to have been largely voluntary on the part of Mrs. Wilson, if also on the part of respondent.
Perhaps the strongest circumstance against respondent's position on this appeal is the affidavit he made on November 2, 1933, in support of his application for a change of venue in the divorce suit. The explanation offered by respondent is not entirely satisfactory. However, in addition to bearing in mind the purpose of this affidavit, it is also to be observed that it was made only five days after respondent was served with summons; that his attorney resided at Carson City; and that if his testimony is true the thought may never have entered his mind that title to the Reno property had been taken in Mrs. Wilson's name, in view of the fact that all the other properties were in the company's name. Looking at the matter from that point of view, respondent would naturally regard the Marsh avenue property as belonging to the corporation.
10. But there is a further reason why we do not feel disposed to reverse this case because of said affidavit. It has been decided by this court, as well as by appellate courts of other states, that the opinion of either spouse as to whether property is separate or *Page 368 
community is of no weight. Barrett v. Franke, 46 Nev. 150, at page 180, 208 P. 435; 31 C.J. 54.
Counsel for appellant seem to have the idea that said affidavit is conclusive upon respondent. They cite Martin v. Dixon, 49 Nev. 161, 241 P. 213, and Peterson v. Pittsburg Silver Peak Gold Mining Co., 37 Nev. 117, 140 P. 519. But those cases decide simply that such statements and documents as were there considered, being against the interest of the party making or executing them, are admissible in evidence against such party. If the lower court in the case at bar had excluded respondent's affidavit, it would undoubtedly have constituted reversible error.
The contention that Mrs. Wilson acquired separate title to the property in dispute by adverse possession or prescription we do not deem sufficiently serious to call for discussion.
The order and decree appealed from are affirmed.