DOROTHY BAKEWELL KELLY, APPELLANT, v. WILLIAM CODY KELLY, RESPONDENT.

No. 5900

April 21, 1970                    468 P.2d 359

*Hibbs & Bullis,* of Reno, for Appellant.

*Laxalt, Berry, Allison & LeBaron,* of Carson City, for Respondent.

## OPINION

By the Court, COLLINS, C. J.:

This is an appeal in a divorce action between Dorothy Bakewell Kelly (plaintiff below) and William Cody Kelly (defendant below). The single issue requiring our review is the lower court's determination there was no community property of the parties to be divided. We affirm that judgment.

Dorothy and William, each of whom was married before, were wed in Sewickley, Pa., January 25, 1964. Dorothy had no children of her first marriage; William had four. The parties resided in Cincinnati, Ohio, from then until April, 1965, when they moved to Washington, D.C. In April, 1966, they moved to Glenbrook, Nevada. On June 2, 1967, Dorothy commenced this divorce action. Because there were complex issues to be resolved, the parties stipulated, and the court ordered reference of the cause to a Master, Gordon W. Rice, Esq., to try all issues and recommend findings of fact, conclusions of law and judgment of the court. On February 12, 1969, the Master filed a Memorandum Decision on the merits of the cause and recommended findings and conclusions to the court, in which Dorothy was to be granted the divorce as the party least at fault. She was to be conditionally awarded alimony of $1,500 per month for a period of two years, and she was awarded a statue valued at approximately $12,000, found by the Master to have been a gift to her by William. The Master found there were no children born of the marriage and that the parties owned no community property.

Those findings and conclusions were adopted in toto by the lower court, which entered final judgment in accordance therewith. It is from the finding that the parties owned no community property that Dorothy takes this appeal.

In 1962, William, a wealthy man and a lawyer, placed the bulk of his assets in a revocable inter vivos Ohio trust, naming himself as the lifetime income beneficiary, his children as ultimate beneficiaries, and himself and his law associate, Kyle Brooks, as trustees. At the time of his marriage to Dorothy, the assets of the trust were valued at $6,222,000, and he had other assets, outside the trust, valued at approximately $867,-000, most of which he later conveyed to the trust. At the time of the trial in December, 1968, the trust property was valued at approximately $8,000,000 and William owned the following assets in addition to those belonging to the trust:

1. Ten percent interest in Fincastle Land Co. valued at $11,300 and acquired in September, 1967.

2. Twenty-five percent interest in Green Spring, Inc., valued at $25,000 and acquired in March, 1967.

3. Six acres of Florida real estate valued at $12,000, acquired in 1966 as take-down acreage from a purchase made in 1960 which had been foreclosed upon.

4. A $300 investment in Carson-Tahoe Travel, Inc., acquired in February, 1967, and August, 1968.

5. A 15 percent interest in Carson Broadcasting Corp.,

whose value had not been ascertained but which would probably be at least $22,500, acquired in July, 1968. It appears as though none of this had been paid pending the determination of how much 15 percent of the corporation was worth.

6. A $5,000 note dated August, 1956.

7. A boat acquired in May, 1967, and a car acquired in July, 1968, valued at $14,000 total.

8. Furniture, furnishings, and works of art valued at $25,000, acquired between 1940 and 1968.

9. A $3,000 interest in a Caribbean dry-cleaning company, acquired in the summer of 1964 by signing as surety for a loan obtained by the company.

The residence of the parties at Glenbrook was purchased by the trust in September, 1966, the sale being confirmed by a court order out of the First Judicial District. It was never owned by the parties jointly or by William as an individual.

Dorothy contends the finding of the Master, as approved by the court, that there was no community property was in error, and urges this court to reverse the judgment and remand the cause to the lower court to:

"1. Determine the reasonable value of the services rendered by the husband to his various separate properties during the period the parties resided as husband and wife in the State of Nevada and reimburse the community for these services.

"2. Determine the following property interests, which were acquired while the parties resided in Nevada, to be community property:

"A) The 10% interest in the outstanding stock in the Fincastle Land Company.

"B) The 25% interest in the outstanding stock in Green Spring, Inc.

"C) The interest in Carson-Tahoe Travel, Inc.

"D) The 15% interest in Carson Broadcasting, Inc.

"E) The boat purchased in 1967.

"F) The residence at Glenbrook, Nevada.

"G) The furniture and furnishings at the Glenbrook residence.

"3. Determine the amount of enhancement to the husband's separate property that resulted from his skill and efforts during the period of marriage in the State of Nevada and apportion to the community the value of the enhancement resulting from the husband's skill and effort."

The Master, in rendering his Memorandum of Decision on the issue of the accumulation of community property by the

parties during the marriage, said, "THOUGH there has been an accretion of two to three million dollars in MR. KELLY'S separate fortune—While MRS. KELLY'S wealth has not fluctuated from about a quarter million dollars—since the marriage, the parties have accumulated no community property." The record shows that evidence taken by the Master on the accumulation of community property question is in substantial conflict.

Evidence adduced by appellant on that question shows: That during the marriage William's primary occupation or profession was that of manager and investor of his personal assets and those of his blood relatives and rendering services as a financial consultant, advisor and negotiator to those real estate development companies and other businesses in which he had an interest; that William and Dorothy filed joint tax returns in 1965, 1966 and 1967 showing adjusted income for the respective years of $82,000, $117,000 and $78,000, but that William additionally received tax-free income from government securities worth approximately $2,000,000; that William maintained during the marriage various individual bank accounts in Cincinnati identified as investment, personal and income; that William and Dorothy maintained a joint account in Nevada to which deposits were made as needed and used solely to pay household and personal expenses of the parties; that neither William nor the community received any compensation for services rendered by him to the trust, the various trusts of his blood relatives, his law practice, nor business outside the trust in which he was engaged; that William spent a "considerable amount of time" reviewing the conditions in the stock market and the particular investments which comprised the principal assets of the trust; that when William and Dorothy were at his properties in Barbuda, British West Indies, he would spend most of his time in the office going over things, doing work, observing construction work, bookkeeping, introducing his management team to the operation; that William scrutinized the trust records thoroughly and even found bank errors; that as a director of Green Spring, Inc., he attended directors' meetings; that William purchased the Glenbrook, Lake Tahoe, property for subdivision purposes or sale in toto at a profit; that William maintained an office in Carson City; that William investigated and invested in 1967 in a partnership in Carson City known as Carson Travel Center, later incorporated as Carson-Tahoe Travel, Inc.; that in July, 1968, William acquired a 15 percent interest in Carson Broadcasting

Corp., for which he made no investment; that prior to December, 1967, Mr. Gwynn, an investment counselor, did not consummate stock transactions on his own without the advice of one of the trustees nor through 1967 buy or sell any stock for William in the trust without having a discussion with William first. Dorothy also adduced considerable evidence and testimony relating to her allegation of cruelty as a ground of divorce; that after their arrival in Nevada William engaged in excessive drinking, was drunk virtually every day from morning to night.

Evidence adduced by respondent on that question shows: That the property owned by William and Dorothy prior to their marriage was separate property, both having been domiciliaries of a common-law, as distinguished from community property, jurisdiction; that the trust created by William in 1962 was composed of his separate property and credit; that Dorothy did not contribute to those assets; that prior to their residence in Nevada, both William as to his nontrust assets and Dorothy as to her separate property, insisted by word and deed their properties be maintained as separate property of each; that after arrival in Nevada there was no change in their property acquisitions; that all additions to the trust after arrival in Nevada came from William's funds; that except for the one joint bank account in Nevada for family and personal expenses, each party maintained separate bank accounts; that each party had separate stock and bond portfolios and separate investment advisers; that no evidence was presented by either party showing that any piece of separate property was agreed to be converted to community property or that there was a commingling of the separate properties; that William expended considerable money on behalf of Dorothy for marital support, clothes, travel, jewelry and expenses; that after arrival in Nevada each party continued to possess and manage their separate funds and properties in a fashion identical to that followed in Ohio and Washington, D.C.; that since March, 1965, the accretion in value of the Kelly trust was due either to natural enhancement or outside investment counsel advice by Mr. Phillip Gwynn, Executive Vice President of an investment counselling firm, and Mr. J. Austin White, municipal bond counsel, who had been personally and totally responsible for all activities of the common stock and governmental bond portfolios; that William had nothing more than a good layman's knowledge of the stock market; that the accretion in the value of the Kelly trust from March, 1965, through the time of the divorce would have occurred whether the portfolio

was owned by William or a person in a mental institution; that William acknowledged his incessant and excessive drinking.

In resolving that conflicting testimony and evidence, the Master in his Memorandum of Decision noted: "MR. KELLY'S separate property has not been augmented in any appreciable amount by the endeavors of the parties to this action, or, by the endeavors of either of them. MR. KELLY'S admitted excessive drinking has precluded any worthwhile effort in this respect by him. His drinking diminished only during the time he was completely engrossed in affairs of the Republican National Committee early in the marriage. An expert has ever since controlled and directed MR. KELLY'S business."

1.  We have previously held in cases adjudicating marital rights that if there is substantial evidence to support the lower court's findings, we will not reverse that determination upon appeal. Shane v. Shane, 84 Nev. 20, 435 P.2d 753 (1968); Zahringer v. Zahringer, 76 Nev. 21, 348 P.2d 161 (1960); Ormachea v. Ormachea, 67 Nev. 273, 217 P.2d 355 (1950). There is substantial, albeit conflicting, evidence in the record before us to support the determination of the Master and the lower court that there were no community property rights owned by the parties at the time of the divorce, unless, as appellant asserts, the Master applied an inappropriate legal principle.

2.  Appellant objects to the long-standing rule of Lake v. Bender, 18 Nev. 361, 4 P. 711 (1884), in which it is stated: "[I]f profits come mainly from the property, rather than the joint efforts of the husband and wife, or either of them, they belong to the owner of the property, although the labor and skill of one or both may have been given to the business. On the contrary, if profits come mainly from the efforts or skill of one or both, they belong to the community." 18 Nev. at 392. She contends that this all-or-nothing rule is inequitable and should no longer be followed because it often fails to give the community credit for the application of a spouse's skill and effort to his or her separate property during marriage.

*Lake v. Bender* is but one approach to resolving a most difficult problem resulting from a conflict between the fundamental community property principle that the labor and skills of a spouse belong to the community, Laughlin v. Laughlin, 155 P.2d 1010 (N.M. 1944); 1 W. de Funiak, Principles of Community Property § 71 (1943), and the statutory concept

grafted on to the community property law that the rents, issues, and profits of separate property remain separate property, NRS 123.130.[1] See King, The Challenge of Apportionment, 37 Wash.L.Rev. 483 (1962).

Under Spanish community property law as it existed in California at the time of its cession from Mexico, which Nevada adopted (Nixon v. Brown, 46 Nev. 439, 214 P. 524 (1923)), fruits and profits of the spouses' separate property was deemed community property. California, however, modified that classical rule of community property in George v. Ransom, 15 Cal. 322, 76 Am.Dec. 490 (1860), and held that recognition of separate property by the California constitution meant that fruits and profits of separate property remained separate and did not enter the community. Nevada reached that same result in Lake v. Bender, supra, at 382–84, and the principle was given legislative approval in ch. 119, § 1, [1873] Stats. of Nev. 193, which provided that the rents, issues and profits of separate property remained separate. That provision has continued unchanged to the present and is now found in NRS 123.130.

In urging this court to depart from the all-or-nothing approach of *Lake v. Bender* and apportion the increase in separate property between the community and the separate property, appellant refers us to Ormachea v. Ormachea, 67 Nev. 273, 297, 217 P.2d 355 (1950), where this court said: "For many years it has been recognized that the earnings of either a husband or a wife are community property; it is also accepted that if the skills and efforts of either party, or both, are essential to the profits gained from the operation or management of separate property, then *in at least a part* the profits are community property." (Emphasis added.)

That quotation from *Ormachea* was obiter dictum, because the facts showed there was an inseparable commingling of separate and community property, making all the profits property of the community.

---

[1]NRS 123.130 reads: "1. All property of the wife owned by her before marriage, and that acquired by her afterwards by gift, bequest, devise or descent, with the rents, issues and profits thereof, is her separate property. 2. All property of the husband owned by him before marriage, and that acquired by him afterwards by gift, bequest, devise or descent, with the rents, issues and profits thereof, is his separate property." NRS 123.220 reads: "All property, other than that stated in NRS 123.130, acquired after marriage by either husband or wife, or both, except as provided in NRS 123.180 and 123.190, is community property." NRS 123.180 and 123.190 are not applicable to this case.

We believe appellant is attempting to urge for our consideration a question that is not before us. The Master found, and the lower court approved the finding, that William rendered no services of value to his separate property. There is substantial, if conflicting, evidence to support this finding. If the community made no measurable contribution to the enhancement of William's separate property, it would not, under any of the alternatives to *Lake v. Bender,* be entitled to an apportionment of any increase in the separate property, and, of course, would not be entitled to reimbursement for his valueless services. See In re Barnes Estate, 17 P.2d 1046 (Cal.Dist.Ct.App. 1932). There is, therefore, no need at this time to re-examine *Lake v. Bender.* Had there been a finding of services rendered to his separate estate, then we believe that this issue would have been squarely before this court on appeal.

3. Appellant's final contention is that the Master and lower court erred in finding none of the 9 assets and the home at Glenbrook described above was community property.

While it is true that all property acquired after marriage is presumed to be community property, the presumption may be rebutted by clear and convincing evidence. Zahringer v. Zahringer, 76 Nev. 21, 348 P.2d 161 (1960); Carlson v. McCall, 70 Nev. 437, 271 P.2d 1002 (1954); In re Fuller, 63 Nev. 26, 159 P.2d 579 (1945); In re Wilson's Estate, 56 Nev. 353, 53 P.2d 339 (1936); Jones v. Edwards, 49 Nev. 299, 245 P. 292 (1926); Barrett v. Franke, 46 Nev. 170, 208 P. 435 (1922); Lake v. Bender, 18 Nev. 361, 4 P. 711 (1884).

Title to community property may be vested in either spouse without losing its character as community property, so that one must look to the source of the funds with which it was acquired. If acquired by community funds or credit, it would be community property; if by separate funds or credit, it would be separate property. In re Wilson's Estate, 56 Nev. 353, 53 P.2d 339 (1936).

According to the findings of the Master and the lower court, William's only income was from his separate property, to the production of which he contributed an inconsequential or no effort. Thus, the funds used during the marriage to acquire

these nontrust assets could only have come from William's separate property. Appellant has therefore not proven by clear and satisfactory proof these assets were purchased with community funds or credit or acquired by William's community toil or talent. Barrett v. Franke, supra; Frederickson & Watson Constr. Co. v. Boyd, 60 Nev. 117, 121, 102 P.2d 627 (1940).

4. We would be remiss if we did not note that during the marriage William did contribute from his separate funds some 40 to 50 thousand dollars per year to the support of the "family," which for the purpose of this appeal included only Dorothy and himself.

Judgment affirmed.

ZENOFF, BATJER, MOWBRAY, and THOMPSON, JJ., concur.