SCHERRY HARRAH, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4325–75, 9790–76.     Filed August 22, 1978.

*James E. Merritt, Laura Stern Seaver*, and *N. Keith Kellison*, for the petitioner.

*Eugene H. Ciranni*, for the respondent.

DRENNEN, *Judge:* In these consolidated cases respondent determined deficiencies in petitioner's income tax as follows:

| *Docket No. 4325–75* | | *Docket No. 9790–76* | |
| --- | --- | --- | --- |
| 1969 | $39,063 | 1974 | $53,506 |
| 1970 | 92,677 | | |
| 1971 | 82,120 | | |

The notices of deficiency raise several issues which have been settled by the parties. The issue to be resolved in this opinion was severed from those remaining for trial or settlement. That issue is whether certain property received by petitioner under a document entitled "Agreement" dated March 3, 1969, between William F. Harrah and petitioner, Scherry Harrah, which was

"ratified, approved, and incorporated" in a decree of divorce entered by the Second Judicial District Court of the State of Nevada, for the County of Washoe, was received by petitioner as a division of community property or was a transfer by William F. Harrah to petitioner of his separate property in exchange for petitioner's marital or other rights. The agreement was negotiated by counsel for William and Scherry Harrah incident to their divorce, which divorce decree, entered March 3, 1969, referred to the instrument as a written property settlement and child custody agreement. Since the principal assets received by petitioner under the agreement (hereinafter referred to as settlement agreement), shares of stock in Harrah Realty Co. and Harrah South Shore Corp., were either sold by petitioner or transferred to a trust and then sold, a question has arisen as to petitioner's basis in the property received. If she received the property as a division of community property, as indicated in the settlement agreement, her basis was the community basis in the property. If the property she received was the separate property of William F. Harrah, her basis would probably be the fair market value of what she gave up in exchange for the property received.

We will not be concerned in this opinion with the amount of petitioner's basis, be it community or otherwise, nor with whether petitioner was taxable on the income of the trust, which questions and others will wait for later disposition. Consequently, no decision will be entered by this Court at this time in these cases.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

On the date that each of her petitions in these cases was filed, petitioner Scherry Harrah (hereinafter referred to as Scherry) resided in Reno, Nev. She filed her individual income tax returns for the taxable years 1969, 1970, 1971, and 1974 with the Service Center of the Internal Revenue Service at Ogden, Utah.

Scherry and William F. Harrah (hereinafter referred to as William) were first married to one another in Gardnerville, Nev., on August 5, 1948. They were divorced by a decree of divorce in Nevada on March 11, 1952. In connection with this divorce the Harrahs, with the assistance of counsel, entered into a property

settlement agreement which was approved by the court granting the divorce and made a part of the divorce decree.

On July 1, 1952, Harrah's Club was incorporated and all of the stock of the corporation was issued to William as his separate property. On July 1, 1952, Harrah's Land Development Co. was incorporated and all of the stock of that company was issued to William as his separate property. On August 4, 1952, Harrah's Bingo Club, Inc., was incorporated and all of the stock of that corporation was issued to William as his separate property.

Although divorced by decree of March 11, 1952, Scherry and William had continued living together since March 13, 1952, but they held themselves out to be unmarried, single persons. Thus, Harrah's Club, Harrah's Land Development Co., and Harrah's Bingo Club, Inc., were incorporated and all of their stock was acquired by William while William was unmarried.

Scherry and William were married to one another for the second time on December 30, 1954, in Winnemucca, Nev. Prior to this marriage, Scherry and William executed an antenuptial agreement which provides in part:

In anticipation [of the second marriage] they desire to fix and determine by ante-nuptial agreement the rights and claims that will accrue to each of them in the estate and property of the other by reason of the marriage, and to accept the provisions of this agreement in lieu of and in full discharge, settlement and satisfaction that either may hereafter have against the other.

\*       \*       \*       \*       \*       \*       \*

4. Miss Harrah [Scherry] hereby waives and releases any and all claims of every kind, nature and description that she may acquire as Mr. Harrah's surviving spouse in his estate upon his death, save and except as herein set forth in paragraphs 1, 2 and 3 hereof.[1]

5. Miss Harrah acknowledges that she has certain real and personal property of her own. Mr. Harrah hereby waives and releases any and all rights and claims of every kind, nature and description that he may have in said property.

6. Miss Harrah acknowledges that all of the property, both real and personal, which Mr. Harrah now has is his own separate property and that she has no interest therein.

7. Each party shall during his or her lifetime keep and retain sole ownership, control and enjoyment of all property, real and personal, now owned or hereafter acquired by him or her, free and clear of any claim by the other.

On June 1, 1958, Harrah's Land Development Co. merged with

---

[1]Scherry was to receive $75,000 from William's estate upon his death, subject to certain conditions.

Harrah's Bingo Club, Inc. The surviving entity was renamed Harrah Realty Co., Inc. William, sole shareholder of both corporations prior to the merger, remained the sole shareholder of Harrah Realty Co., Inc.

Harrah Realty Co., Inc., functions as a landlord which owns real estate and leases it to Harrah's Club. The lease agreements provide for fixed rental payments rather than rental payments determined from a percentage of sales or income of Harrah's Club.

Harrah's Club operates gambling casinos and hotels, restaurants, and bar facilities in Reno and South Lake Tahoe, Nev. For several years Harrah's Club has been either the first or second largest employer in Nevada. In 1969 it employed approximately 3,500 persons.

Harrah South Shore Corp., a California corporation, was incorporated in October 1959. William purchased for $2,000 all of its issued and outstanding stock which amounted to 2,000 shares. The source of the funds used by William to purchase this stock is not certain. He probably borrowed the funds from Harrah's Club, however. Harrah South Shore Corp. also functioned as a landlord of Harrah's Club. It owned and leased to Harrah's Club the parking lots located across the State line in California but adjacent to the Harrah's Club Lake Tahoe Casino which was in Nevada. Harrah South Shore Corp. also performed advertising and promotional services for Harrah's Club.[2] It sponsored bus and air transportation programs to Lake Tahoe and it maintained reservation offices in various California cities.

Throughout the period from the date of incorporation or formation of Harrah's Land Development Co., Harrah's Bingo Club, Inc., Harrah Realty Co., Inc., Harrah South Shore Corp., and Harrah's Club to March 3, 1969, William was the sole shareholder of each corporation and represented that these stockholdings were his separate property. On the joint Federal income tax return filed by the Harrahs for the taxable year 1967, the stock of Harrah's Club is represented as William's property. In 1967, estate planning for William was prepared on the assumption that the Harrah Realty Co., Inc., stock was his separate property.

---

[2]Harrah's Club also employed an advertising agency for these services.

The joint return also indicates that William was employed by Harrah's Club and Harrah Realty Co., Inc. His salaries from the corporations were $186,000 and $25,000, respectively.[3]

The Harrah's second marriage proved unsuccessful and sometime during 1968 the couple decided to obtain a divorce. As a result of this decision William and Scherry and their representatives negotiated the settlement agreement referred to above.

In these negotiations Scherry was represented by Harry B. Swanson, an attorney in Reno. Swanson employed Albert E. Cartlidge, a certified public accountant in Reno, to assist him.[4] William was represented by Louis Mead Dixon, an attorney practicing in Reno, and by Joseph W. McMullen, a certified public accountant also in Reno. Dixon had represented William personally for approximately 10 years and had represented his corporations on a fairly regular basis since 1957. Throughout the period 1954 through 1969, the accounting firm, Semenza, Kottinger & McMullen, was retained by William and each of his corporations to render accounting services. McMullen was the partner in charge of these accounts and was responsible for reviewing all workpapers leading to the preparation of financial statements for the corporations.

The negotiations over the settlement agreement were protracted and intense and were conducted entirely at arm's length. During the course of the negotiations McMullen, at Dixon's request, prepared various summaries of the financial status of Scherry and William Harrah and the Harrah corporations in late 1968 and early 1969 based on the financial statements of the corporations available to him, to be used in the negotiations. Copies of most of these documents were supplied to counsel for Scherry. McMullen also calculated the tax consequences of various settlement proposals. Most of the figures contained herein were taken from McMullen's workpapers. Pursuant to Dixon's instructions the capital stock of Harrah's Club, Harrah Realty Co., Inc., and Harrah South Shore Corp. were reflected

---

[3]McMullen, William's accountant, see *infra*, testified that William probably was president of Harrah's South Shore Corp. However, either he earned no salary from his position or he had resigned this position before 1967. The joint return lists salary income only from Harrah's Club and Harrah Realty Co., Inc.

[4]Neither Swanson nor Cartlidge testified in this case.

on the financial statements concerning William as William's separate property.

According to McMullen's workpapers, from August 5, 1952, to July 31, 1968, Harrah Realty Co. or its predecessors acquired real estate at a total cost of $3,315,860.79 and improvements thereon costing $8,103,301.38, most of which were acquired subsequent to 1954, when Scherry and William were remarried. The corporation also had a remainder interest in a building acquired in 1966 and 1967 at a cost of $792,976.35. As of July 31, 1968, the book value of Harrah Realty Co. capital stock ($46,500) and retained earnings ($2,567,193) was $56.21 per share. If the value of its real estate was increased to estimated market value (per appraisal) the net worth of the corporation increased to $13,445,693, or $289.15 per share.

Financial statements of Harrah South Shore Corp., as of September 30, 1968, reflect capital stock ($2,000) and retained earnings ($588,324.67) totaling $590,324.67, and as of September 30, 1969, reflect stockholder's equity of capital stock ($2,000) and retained earnings ($630,990) totaling $632,990.

A financial statement of Harrah's Club as of June 30, 1968, reflects capital stock (150,000 shares issued at $1 par = $150,000) and retained earnings of $20,777,889 for a total book value of the capital stock of $20,927,889. Most of the real estate and improvements, having a depreciated cost of $20,921,992, were acquired subsequent to 1954.

According to McMullen's workpapers the net worth of the community property owned by William and Scherry as of September 30, 1968, which included the 2,000 shares of Harrah South Shore Corp. but none of the stock of either Harrah's Club or Harrah Realty Co., Inc., was $654,925. The net worth of William's separate property as of September 30, 1968, including all of the stock of both Harrah's Club and Harrah Realty Co., but not including a contingent liability for Federal income taxes, was reflected as being $23,127,238.

Various proposals and counter-proposals were made by the parties and their representatives during the negotiations regarding Scherry's claims for support and a community share of the appreciation in William's separate property. Initially, Swanson claimed that all of the stock of the Harrah corporations was community property while Dixon claimed that it was

William's separate property. Both parties retreated from these positions during the course of the negotiations.

Dixon believed that Swanson predicated his claim that all of the stock was community property on the theory that the separate and community assets of the Harrahs had been inextricably commingled over the years of their marriage. Swanson, Dixon felt, was relying on *Ormachea v. Ormachea*, 67 Nev. 273, 217 P.2d 355 (1950), as authority for his claim. Dixon personally believed that Scherry's claim of commingling had some validity. In particular he was concerned that the Harrahs had personally guaranteed bank loans or loans from Harrah's Club to construct properties in Reno and South Shore Lake Tahoe, and had executed a promissory note that made Harrah South Shore Corp. possible. Moreover, he believed it possible that the Nevada Supreme Court would adopt a formula apportioning the appreciation in value of separate property between the community and separate property interests of the Harrahs if confronted with the facts and circumstances surrounding the acquisition of and manner of dealing with stock of the corporations. William desired that Scherry have no claims to or interest in the stock of Harrah's Club, essentially the operating entity of his enterprises. The parties did not discuss inchoate marital rights nor did they bargain with regard to inchoate marital rights in reaching the agreement. The representatives of the Harrahs were aware of the tax consequences of the various settlement offers and they prepared schedules showing the tax ramifications of the proposals to their clients.

The settlement agreement reached by the Harrahs provides in part:

VI. In view of their intention to live apart for the rest of their lives, the parties are desirous of settling the matters relating to their respective property and support rights. The parties also desire to settle custody, support and education of the children. * * *

VII. During their second marriage, the parties have acquired certain community property, notwithstanding the Husband's prior ownership of substantial separate property. The exact nature, ownership, extent and value of the community property is difficult or impossible to ascertain with mathematical precision and exactitude.

Now THEREFORE, in consideration of the premises and the mutual promises and undertakings hereinafter set forth and for other good and valuable consideration, the parties agree as follows:

\* \* \* \* \* \* \*

4. The community property of the parties shall be divided equally between them, one-half to the Husband and one-half to the Wife as follows:

(a) The Husband hereby grants, assigns and sets over to the Wife as her one-half interest in the community property, the same hereafter to be her sole and separate property, all of his right, title, interest and claim in and to the following described property:

\* \* \* \* \* \* \*

(2) All of the issued and outstanding capital stock of HARRAH SOUTH SHORE CORPORATION, a California corporation, consisting of 2,000 shares;

(3) 5,000 shares of the capital stock of HARRAH REALTY CO., a Nevada corporation;

Scherry also received as her share of the community property $250,000 in cash, a 1967 Rolls Royce, a 1967 Ferrari, a 1968 Plymouth station wagon, the amounts in the Harrahs' household checking account and in her personal checking account, and all her personal clothing, furs, jewelry, funds, and personal effects.

The agreement further provided:

(b) The Wife hereby grants, assigns and sets over to the Husband as his one-half interest in the community property, the same hereafter to be his sole and separate property, all of her right, title, interest and claim in and to the following described property:

\* \* \* \* \* \* \*

(12) The community interest of the Wife in the shares of stock of the Husband in HARRAH'S CLUB, a Nevada corporation, and HARRAH REALTY CO., a Nevada corporation, which community interest is conclusively agreed and determined to be equal to the difference in value between the value of the other community property above set over to the Husband and the value of the community property above set over to the Wife. It is the intention and agreement of the parties that the division of community property between them is and shall be equal in value and that the relinquishment of all the Wife's interest in such stock (except for the 5,000 shares of HARRAH REALTY CO. above set over to the Wife) constitutes the relinquishment of an interest sufficient to equalize the division. It is further agreed that the Wife has no other claim of community interest in such stock.

William also received as his share of the community property the residence, furnishings, and real property referred to as Rancharrah, a vacation residence, furnishings, and real property located in Stanley, Idaho, the lease of a parcel at the Stanley Airport, two Jeep station wagons, a flat-bed truck, two motorcycles, Modern Classic Motors, the amounts in his personal checking account, and all his personal clothing, jewelry, funds, and personal effects.

The agreement also provided:

6. Contemporaneously herewith the Wife acknowledges that all of the remaining property of the Husband constitutes, and shall hereafter constitute, his sole and separate property in which the Wife has no right, claim or interest of any kind. Such property, together with the community interest which was set over by the Wife to the Husband in paragraph 4(b) above, is described as follows:

(a) 150,000 shares (comprising all of the issued and outstanding stock) of HARRAH'S CLUB, a Nevada corporation, and all right, title, interest and claim of the Husband in and to HARRAH'S CLUB.

(b) 41,500 shares (comprising all of the issued and outstanding stock except for 5,000 shares above set over to the Wife) of HARRAH REALTY CO., a Nevada corporation, and all right, title, interest and claim of the Husband in and to HARRAH REALTY CO., except for the interest above set over to the Wife.

William acknowledged that Scherry's stockholdings in Inflight Motion Pictures, El Ruth Cosmetics & Products, Inc., and Premiere of Hollywood, Inc., constituted her separate property in which he had no interest.

The agreement also provides:

8. The Husband shall pay to the Wife as child support the sum of $5,000.00 per year, per child, for the support and maintenance of each of the minor children, the total sum being $10,000.00 per year. * * *

\* \* \* \* \* \* \*

12. The Husband shall pay to the Wife for her support and maintenance as alimony the sum of $90,000.00 per year. Such sum shall be payable in equal monthly installments payable monthly in advance on or before the 10th day of each and every calendar month. The Husband may, if he desires, pay such alimony in equal quarter annual installments of $22,500.00 each, payable quarterly in advance on or before the 10th day of each and every calendar quarter. The alimony payments shall continue without modification for a period of eleven years from the date of the first payment or until the death of the Wife, whichever event shall first occur, at which time the alimony payments shall absolutely cease and terminate. The remarriage of the Wife or the death of the Husband shall not terminate the obligation of the Husband or his estate for such alimony payments.

The agreement further provided that each party shall be fully released by the other from any obligation for alimony, etc., and each party accepts the provisions herein in full satisfaction of all property rights and obligations for support arising out of the marital relationship of the parties. Also, that each party relinquish all rights under present or future laws to share in the

estate of the other, except as provided by express provisions of a will.

The settlement agreement was dated March 3, 1969, and was signed and acknowledged by both William and Scherry on that date. The signatures of both Dixon and Swanson were affixed indicating their approval.

Sometime prior to March 3, 1969, Swanson drafted a complaint for divorce in which he alleged that the Harrahs had no community property. The draft was sent to Dixon for his suggestions or modifications. Dixon suggested that the allegation be that the Harrahs acquired certain community property during their marriage. In a note to Swanson, he stated:

> The result that we are after is a finding [by the divorce court] that there is community property but that it has been divided by the agreement. Your allegation that there is no community property is undoubtedly true from a legal standpoint but I am fearful that the Internal Revenue Service may misconstrue the allegation.

Dixon surmised that Swanson made the allegation through an oversight or erratic thinking. He explained that a common allegation in divorce complaints in Nevada is that there is no community property to be divided by the divorce court because the parties have entered into a prior agreement dividing that property. The draft of the complaint was amended to recite that during the marriage the parties acquired certain community property and prayed that all community and other property rights and obligations arising out of and incident to the marriage be decreed in accordance with the settlement agreement entered into by the parties and that the agreement be incorporated in the decree of divorce.

The complaint in the divorce action and the agreement were filed in the Second Judicial District Court of Nevada, County of Washoe, on March 3, 1969, at 3:34 p.m. The Harrahs' divorce was given special treatment by the court. It was scheduled on the afternoon calendar rather than the normal morning calendar and a private hearing was granted.

After introducing the agreement in evidence, Scherry testified in the divorce action as follows:

> Q. You have alleged in your complaint that during the marriage you and your husband acquired certain community property, is that true?
> A. True.

Q. You have, however, settled all of your community property by the written agreement we have just mentioned, have you not?
A. Yes.

      \*      \*      \*      \*      \*      \*      \*

Q. And in this connection, do you feel that the agreement is fair, just and equitable to both you and your husband?
A. Yes.

      \*      \*      \*      \*      \*      \*      \*

Q. * * * is it your desire that the agreement which is now in evidence be incorporated in the decree of divorce and both you and your husband ordered to comply with its provisions?
A. Yes.

McMullen testified in the divorce action that during the negotiations that took place prior to the settlement agreement he had furnished financial information concerning both William Harrah and the various Harrah corporations to Scherry's attorney and accountant as well as to William's attorney, that he had discussed the information with Scherry's representatives, that to the best of his knowledge and belief the financial statements furnished were true and correct, that the assets listed and disposed of in the separation agreement included all of the assets of the parties, and that he had revealed and made available to Scherry and her representatives a complete list of all of the assets and liabilities of William, including the joint income tax returns of William and Scherry for the past 5 years.

The Findings of Fact, Conclusions of Law, and Decree of Divorce entered by the divorce court provides in part:

4. During the marriage the parties acquired certain community property; in this connection, plaintiff and defendant entered into a written * * * Agreement * * * whereby they have settled all community and other property rights * * * [the] written * * * Agreement is fair, just and equitable, and was entered into by and between the parties upon the advice of independent counsel * * *

It was ordered:

3. The community property and other property rights * * * arising out of and incident to the marriage * * * are, decreed in accordance with the terms and provisions of the * * * Agreement * * * and made a part hereof, and each of the parties is hereby ordered to comply with the provisions thereof. * * *

The written decree of divorce above quoted was filed at 4:26 p.m. The divorce proceeding consumed 26 minutes.

On March 13, 1969, Scherry entered into an agreement with Harrah Realty Co. to sell the 5,000 shares of stock of Harrah

Realty Co. she received under the agreement to Harrah Realty Co. for a downpayment of $178,000 plus 16 annual installments of $100,000 each, with interest at 5 percent.

Also on March 13, 1969, Scherry entered into an agreement with Harrah's Club wherein she granted to Harrah's Club an 8-month option to buy from her the 2,000 shares of stock in Harrah South Shore Corp. she received under the agreement for a downpayment of $150,000 plus 16 annual installments of $150,000 each plus interest at 5 percent. Harrah's Club subsequently exercised the option.

On April 4, 1969, Scherry entered into a trust agreement with the First National Bank of Nevada, transferring to it the 2,000 shares of stock in Harrah South Shore Corp., subject to the option given to Harrah's Club to purchase the stock in trust for the benefit of the two adopted children of William and Scherry. When Harrah's Club exercised its option the trust sold the stock to the Club.[5]

## OPINION

The basic legal question involved is whether Scherry Harrah's basis in the assets she received in the settlement agreement should be measured by the basis of those assets as community property of William and Scherry Harrah or by the fair market value of what she gave up in exchange for those assets. This depends on whether the settlement agreement was simply a division of community property, as it purports to be, or was an exchange of Scherry's marital and/or other rights for William's separate property.

In anticipation of their second divorce, William and Scherry negotiated and executed a settlement agreement under which, among other things, Scherry received as her separate property 2,000 shares of Harrah South Shore Corp. and 5,000 shares of Harrah Realty Co., Inc., as a portion of her share of the community property acquired during the Harrah's second marriage. The stock was issued in the name of William. The Harrah Realty Co. stock was acquired by William in 1958 as the result of a merger of two Harrah corporations all of the stock of

---

[5]We will not extend this opinion by reciting more details of the trust agreement. The issue of whether the trust was a grantor trust so that Scherry was taxable on the income of the trust is not before us at this time.

which William had acquired while he was unmarried. The South Shore stock was acquired by William in 1959, after the second marriage. Both of the corporations were essentially real estate holding companies which leased their properties to Harrah's Club for the conduct of its hotel and gambling operations in Reno and Lake Tahoe, Nev. William was the founder, chief executive officer, and sole stockholder of Harrah's Club from prior to the second marriage until the second divorce in 1969.

The settlement agreement was approved, ratified, and adopted by the Nevada divorce court and merged into the divorce decree by order of the court. The agreement provided that the stock that Scherry received was a portion of her share of the community property acquired by William and Scherry during their second marriage.

Petitioner now argues that the community property characterization of the stock in the settlement agreement and the divorce decree are not conclusive determinations of the nature of the property or the transaction disposing thereof for purposes of this Federal income tax controversy, i.e., for purposes of computing the gain on the subsequent disposition of the stock. As a consequence she urges that this Court is required to ascertain de novo upon the evidence before us in this action the character of the stock and the nature of the transfer after examining relevant Supreme Court decisions and Nevada statutes and court decisions. In essence, petitioner would like us to disregard the characterization of the property in the settlement agreement and the divorce decree and allow her to begin again in this Court.[6]

Respondent argues that petitioner may not challenge the characterization in the agreement and divorce decree in this Court for two reasons.[7] First, the agreement as a matter of fact

---

[6]Petitioner's argument in this proceeding that the stocks she received under the settlement agreement were the separate property of William is the antithesis of her argument during the settlement negotiations that they were community property. The more of William's assets that could be characterized as community property the more she could expect to receive in the property settlement agreement.

[7]As a threshold matter, respondent requests in his brief that petitioner be bound by the testimony of the witnesses called by her and that all inferences and assumptions to be drawn from their testimony be drawn in favor of respondent's position. Respondent is aggrieved by the order of this Court bifurcating the trial and by petitioner's failure to testify or to call friendly witnesses. He contends that the trial amounted to third-party discovery in contravention of Tax Court Rules. See Rules 70–85, Tax Court Rules of Practice and Procedure. He argues that petitioner, Swanson, and Cartlidge will be able to provide more beneficial testimony for petitioner at a later trial since they will have had the opportunity to study and prepare a rebuttal on the untried issue of whether the trust is a

equally divided the Harrah's community property. Second, as a matter of policy this Court should not allow petitioner to collaterally attack the decree and the agreement in this action.

A brief review of the relevant legal concepts that must be considered is first in order.

Generally speaking, where community property is divided so that each spouse takes as his separate property certain assets of the community equal in value to other community assets set aside for the other spouse so that each spouse takes one-half the value of the entire community property, the equal division of the community is considered a nontaxable partition of the property, and the basis of the property set aside to each spouse is its basis to the community prior to the division. However, to the extent that one spouse receives separate property of the other spouse, rather than community assets, in exchange for portions of his community property he has sold or exchanged, such portions and gain, if any, must be recognized thereon. *Carrieres v. Commissioner*, 64 T.C. 959 (1975), affd. per curiam 552 F.2d 1350 (9th Cir. 1977). On the other hand, under Delaware law at least, the transfer of a husband's property to the wife in release of her inchoate marital rights upon dissolution of the marriage is a taxable event as to the husband, and the wife takes as her basis in the transferred property the fair market value of the property she receives at the time of the transfer, despite the fact that the Internal Revenue Service permits nonrecognition of any gain to the wife in such an exchange. *United States v. Davis*, 370 U.S. 65 (1962).

The legal rights and interests in property are determined under State law. *Estate of Gamble v. Commissioner*, 69 T.C. 942 (1978). However, *Commissioner v. Estate of Bosch*, 387 U.S. 456 (1967), holds that lower State court decisions adjudicating property rights or characterizing property interests are not necessarily conclusive upon Federal courts when the application of the Federal estate tax statute depends upon the determination of such property rights and interests by the State trial

---

grantor trust rendering the income earned by it taxable to her under secs. 671–678.

Quite frankly, we do not see how the evidence presented at this trial has any bearing on the question of whether the trust was or was not a grantor trust. Resolution of that issue has no relation to whether the divorce decree's characterization of the stock or of the alimony payments is binding upon this Court. Respondent is crying wolf when none is there and we decline to accede to his request.

courts. The highest court of the State is the best authority on its own State law, and if there is no decision by that court, then Federal courts must apply what they find to be the State law after giving "proper regard" to relevant rulings of other courts of the State.

The rights of spouses in property acquired before and during marriage are set forth by statute in Nevada. Property acquired before marriage, together with the rents, issues, and profits derived from it, is separate property. 5 Nev. Rev. Stat. sec. 123.220 (1973) (hereafter NRS). Community property is defined for our purposes as all other property acquired by either or both spouses during marriage unless provided otherwise by a written agreement between the spouses. NRS sec. 123.220. Property acquired during marriage is presumptively community property, *Barrett v. Franke*, 46 Nev. 170, 208 P. 435 (1922); *In re Wilson's Estate*, 56 Nev. 353, 53 P.2d 339 (1936). However, spouses may enter into contracts with each other concerning their property (NRS sec. 123.070); and either spouse may, without the consent of the other spouse, convey or otherwise dispose of his separate property. NRS sec. 123.170. While a husband's separate property may be subjected to payment of his marital obligations, such as support and alimony (NRS sec. 125.150.3), under Nevada law the wife has no dower or other rights in his separate property. Upon the death of either spouse an undivided one-half interest in the community property vests in the other spouse as her separate property, and the remaining one-half is subject to testamentary disposition by the decedent. NRS sec. 123.250. If the decedent dies intestate, a portion of his separate property goes to the surviving spouse. NRS sec. 134.030.

NRS sec. 125.150.1 provides that in granting a decree of divorce the divorce court may award alimony, in a specific sum or as specified periodic payments, and shall make such disposition of the community property of the parties as appears just and equitable. There is no provision for division of the separate property of the spouses, except to provide support for the other spouse and the children. See *Lake v. Bender*, 7 P. 74 (Nev. 1885).

While NRS sec. 123.130.2 provides that all property owned by the husband prior to marriage, and all the rents, issues, and profits thereof are his separate property, a question arises whether the appreciation in value of the husband's separate property during the marriage is his separate or community

property. Prior to 1973, the Nevada Supreme Court had taken a sort of all-or-nothing approach to this question. In *Lake v. Lake*, 18 Nev. 361, 4 P. 711 (1884), affd. sub nom. on rehearing *Lake v. Bender*, 7 P. 74 (1885), the court held that if the profits came mainly from the husband's separate property itself, rather than his personal efforts, or those of himself and wife, the profits belonged to him, although the labor and skill of one or both may have been given to the business. However, if the profits came mainly from the efforts or skill of one or both spouses, they belong to the community. In *Ormachea v. Ormachea*, 67 Nev. 273, 217 P.2d 355, 367 (1950), the court noted that the earnings of either a husband or wife are community property, and that if the efforts of either spouse are essential to the profits gained from the operation of separate property, then at least a part of the profits are community property. But where no effort is made to keep the separate and community property segregated, and they become so intermingled that it is impossible to determine their source, such intermingled properties will be considered community property. It was not until the Nevada Supreme Court decided *Johnson v. Johnson* in 1973 (89 Nev. 244, 510 P.2d 625 (1973)) that the Nevada courts recognized that the appreciation in value should be apportioned between separate and community property, as it had been for years in California. The court held "that the increase in value of separate property during marriage should be apportioned between the separate property of the owner and the community property of the spouses," where both the investment of separate property and the labor and skill of the parties contributed to the increase in value. It also held that Nevada courts, in their discretion, should apportion the profits from separate property by following the formula of *Pereira v. Pereira*, 156 Cal. 1, 103 P. 488 (1909), or of *Van Camp v. Van Camp*, 53 Cal. App. 17, 199 P. 885 (1921), whichever was most equitable under the circumstances.

And finally, we should not overlook the rule of this Court that the burden of proof is on petitioner (Rule 142(a), Tax Court Rules of Practice and Procedure), and petitioner must prove by competent evidence error in the respondent's determination, which bears a presumption of correctness. *Welch v. Helvering*, 290 U.S. 111 (1933). And we note the broad proposition laid down by the Nevada Supreme Court in *Gamble v. Silver Peak Mines*, 35 Nev. 319, 133 P. 936, 937 (1913), that "'one who has taken a

particular position in the course of a litigation must, while that position remains unretracted, act consistently with it.'" See also *Schulz v. Commissioner*, 294 F.2d 52 (9th Cir. 1961); *Rogers v. United States*, 290 F.2d 501 (9th Cir. 1961).

Applying the above legal concepts to the evidence and facts in this case, we have concluded that the transaction wherein Scherry received the 2,000 shares of stock of Harrah South Shore Corp. and 5,000 shares of stock of Harrah Realty Co., along with other properties, was in fact a division of community property and must be recognized as such for Federal tax purposes.

There is no question in our minds that the settlement agreement that was ratified, approved, and adopted by the divorce court was negotiated at arm's length by adverse parties and in an adverse atmosphere. We believe the representatives of both parties believed that Scherry had a valid claim that a part of the increase in value of the Harrah corporations was community property and would be so declared by the Nevada courts if the issue was litigated. That their beliefs were justified is borne out by the subsequent decision of the Nevada Supreme Court in *Johnson v. Johnson, supra*. The big question was how much of the increase in value could be considered community property. The original investments of William were certainly responsible for some of the appreciation, but the efforts of William, and probably Scherry as well, were also responsible for such appreciation. But the two factors were so intermingled that the parties believed it would be impossible to delineate with any exactitude the portions for which each factor was responsible. So the parties finally negotiated an amount which they concluded should be considered community property, which was twice the value of the community assets received by Scherry under the agreement. Also negotiated were the assets that should be taken by Scherry representing her one-half of the community. William was to receive as his share of the community property whatever interest Scherry had in the assets set over to him, which was assumed to equalize in value the division of the entire community as between the two spouses. The agreement was then submitted to the divorce court with the request that it be approved and adopted by the court as a part of the divorce decree.

While the judge of the divorce court may not have taken the

time during the divorce hearing to examine the document in detail, we feel certain he was generally aware of the nature of the settlement. There was no collusion in the sense that the parties submitted to the court a proposal that was not realistic— and there is no reason that the divorce court should not accept the assurances of the parties that the agreement was equitable and just. Certainly a court should not insist that an issue such as this be litigated in open court—it had in effect been litigated by the parties amongst themselves before going into court.

The divorce court did approve, ratify, and adopt the settlement agreement making it a part of its decree and ordered the parties to comply with it. This decree became final and fixed the rights of the parties in the properties involved.

We cannot believe that it would make much difference whether we consider the agreement to have retained its vitality and be the controlling document or whether we recognize that the agreement was submerged in the decree and the decree became the controlling document—except possibly with reference to petitioner's efforts to go behind one or the other. Both spoke in the same language and have the same meaning. We will hereinafter refer to it as the decree.

The decree acknowledged that Scherry and William had accumulated community property during the course of their marriage and that the purpose was to divide that community property equally between the parties. All of the property that was tainted with common ownership was not specified; the decree simply set aside to Scherry certain assets that she acknowledged equaled in value one-half of the community assets. In return she released to William all of her interest in the remaining assets which *interest* represented William's one-half share of the community property. No effort was made to divide equally all of the assets mentioned in the agreement—it is obvious that the value of the assets that were set aside to William greatly exceeded the value of the assets set aside to Scherry. This was in recognition of the fact that all of William's separate property had not been tainted with a common interest and this was a realistic and reasonable method of solving the problem of just how much of it had become community property.

Scherry argues now that none of William's separate property had become community property and that William exchanged his separate property for her somewhat nebulous marital rights.

This is the opposite of the position she took during the negotiations and is taken because it is to her advantage taxwise to do so. In other words, she wants her cake but wants to eat it too. But an examination of the so-called marital rights Scherry had to bargain with belies this argument. Under Nevada law, as we read it, Scherry had no vested rights in William's separate property; she had the right to support for herself and her children and she had an inchoate right to share in William's estate if he died intestate before she did. Her right to support and support for the children appears to have been separately bargained for and taken care of. She received $90,000 a year for 11 years as alimony for her support and she received $10,000 a year as support for the children. Her inchoate right to share in William's estate was of little value in light of the fact that William could have cut her out of his estate by will. Furthermore, it is possible that she had relinquished this right in paragraph 4 of the antenuptial agreement, quoted in our findings of fact. Thus, it becomes apparent that what Scherry gave up in exchange for the property received was a bona fide claim to one-half of all the property owned by the parties, whether originally owned as separate property by either Scherry or William, on the theory that the profits of William's separate property had become so commingled with the community property that most of the appreciated value was community property. So we are left with the conclusion that the decree was in fact a division of what was thought to be community property.

To buttress this conclusion we point out that the divorce court had no authority to divide or distribute William's separate property except as required for the support of Scherry and the children, which as pointed out above, was otherwise provided. On the other hand, it did have the authority under Nevada statutory law, NRS sec. 125.150.1, to divide the community property. We believe there is a presumption that the divorce court acted within its authority. *Gamble v. Silver Peak Mines, supra.*

We recognize, however, that the agreement-decree simply recited that the parties had accumulated community property during the course of their marriage and characterized the transaction they were ordered to comply with as a division of community property. And we agree with petitioner that since the application of the Federal tax laws in this situation is

dependent upon the nature of the transaction, we are not bound by the lower Nevada court's characterization of the transaction. *Commissioner v. Estate of Bosch, supra.* See also *Estate of Gamble v. Commissioner, supra.* In this connection we must attempt to place ourselves in the position of the Nevada Supreme Court and determine how it would characterize the transaction. While there was no authoritative decision of the Nevada Supreme Court on the subject at the time this transaction took place, we are convinced that under the circumstances that court would have recognized that the personal efforts of both William and Scherry during their marriage had contributed greatly to the appreciation in value of William's separate property and that the better rule to follow under such circumstances would be to apportion the appreciation in value between William's separate property and the community property in an equitable and just manner. This is what the Nevada court did do in *Johnson v. Johnson, supra,* and we see no need or justification for ignoring that action simply because it took place after the fact and try, instead, to second guess what that court would do.

We also believe the Nevada Supreme Court would have approved the action taken by the divorce court had it been called upon to review it. Once it was established that a part of the appreciation in value of William's property was community property and that an apportionment would be necessary, the only question would be whether the apportionment or division approved by the divorce court was fair and equitable under all the circumstances. Since there were so many indeterminant factors that would have to be given consideration in making an equitable apportionment of the appreciation in value of William's assets between his separate property and the community property, we believe the Nevada court would have recognized that the best way to determine a fair and equitable apportionment would be to approve the noncollusive private settlement negotiated between the parties whose interests were antagonistic and who were aware of all the relevant facts. To do otherwise in this case would be asking for an almost insurmountable task that few modern-day courts can afford to tackle timewise. The parties had agreed on the settlement, the trial court had approved and adopted it, and no good purpose would be served by upsetting it. See *Johnson v. Johnson, supra.* If petitioner

thought otherwise, we believe she should have, and would have, made a more direct attack on the settlement by asking the Nevada divorce court to set it aside.

Even if we concluded that the Nevada Supreme Court, with an eye on *Lake v. Lake, supra,* would have determined that the stock received by Scherry under the decree had originally been the separate property of William and remained the separate property of William up to the time the settlement agreement was entered into, we believe the result reached herein would be the same. Under Nevada law, spouses may enter into contracts with each other, concerning their property (NRS sec. 123.070), and either spouse may, without the consent of the other spouse, convey or otherwise dispose of his separate property. NRS sec. 123.170. Without discussing it in detail, we believe the Nevada courts would, under the circumstances, find that the settlement agreement first effected a transmutation of a part of William's separate property into community property. See *Woods v. Bromley,* 69 Nev. 96, 241 P.2d 1103 (1952); *Mullikin v. Jones,* 71 Nev. 14, 278 P.2d 876 (1955). See also *Woods v. Security First National Bank of Los Angeles,* 46 Cal.2d 697, 299 P.2d 657, 659 (1956), wherein the following quote was approved: "'The object of the oral agreement of transmutation was fully performed when the agreement was made for it immediately transmuted and converted the separate property of each spouse into community property, and nothing further remained to be done.'" While this was a California case, the Nevada Supreme Court has frequently been influenced by California court decisions in its promulgations concerning the rights of spouses in community and separate property, see, e.g., *Mullikin v. Jones, supra; Johnson v. Johnson, supra.* Of course, a transmutation of William's separate property into community property followed by the decree of the divorce court dividing the community property between the spouses would bring the action of the divorce court within its authority under Nevada law as mentioned above.

Petitioner has the burden of proving error in respondent's determination. This is a particularly heavy burden under these circumstances where respondent is relying on the agreement negotiated by Scherry and William and petitioner must prove that the agreement did not mean what it said. *Rogers v. United States, supra.* Petitioner has failed to carry that burden and we

must agree with respondent that the transaction reflected in the settlement agreement-decree was a division of community property with the resultant tax consequences.

*Appropriate orders will be entered.*